**SOLID WASTE AGENCY OF NORTHERN COOK COUNTY, Plaintiff–Appellant,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, et al., Defendants–Appellees.**

No. 98–2277.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1999.

Decided Oct. 7, 1999.

Russell R. Eggert, Mayer, Brown & Platt, Chicago, IL, George J. Mannina, Jr. (argued), O'Connor & Hannan, Washington, DC, for Plaintiff–Appellant.

Ethan G. Shenkman (argued), Department of Justice, Land & Natural Resources Division, Washington, DC, for Defendants–Appellees except Browner.

Myron M. Cherry, Cherry & Flynn, Chicago, IL, for Defendant–Appellee Browner.

Peter Flynn, Cherry & Flynn, Chicago, IL, for Intervenors–Appellees.

Before KANNE, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

This case involves the efforts of a consortium of Illinois municipalities to find a place to dump their trash. The Solid Waste Agency of Northern Cook County ("SWANCC") thought that it had found such a spot in a 533–acre parcel of land straddling Cook and Kane Counties, Illinois. Before its "balefill" could open, however, approximately 17.6 acres of ponds and small lakes located on the parcel had to be filled in. This case presents the question whether the U.S. Army Corps of Engineers ("the Corps"), acting under § 404 of the Clean Water Act ("the Act"), 33 U.S.C. § 1344, had jurisdiction to require SWANCC to obtain a permit for its fill operations. SWANCC initially applied for such a permit, but the Corps denied it. SWANCC then sued, claiming both that the Corps had no business meddling in the matter at all and that it was wrong on the merits. For its part, the Corps claimed jurisdiction under the so-called "migratory bird rule," which interprets the Act as extending to certain intrastate waters based on their actual or potential use as habitat for migratory birds. (The parties dispute whether this is a mere interpretation of statutory language, or something that should be regarded as a freestanding rule—a point that we discuss later in this opinion. Our use of the common phrase "migratory bird rule" is not intended to suggest a position on that issue.)

The district court granted summary judgment in the Corps' favor on the jurisdictional point. At that point, SWANCC decided voluntarily to dismiss the remainder of its claims, so that the district court could enter a final judgment from which it could appeal. See 28 U.S.C. § 1291. We conclude that the Corps properly asserted jurisdiction in this matter, and we therefore affirm.

I

SWANCC is a group of 23 municipalities that banded together to form a municipal corporation for the purpose of locating and developing a disposal site for nonhazardous waste. It found and purchased the 533–acre site to which we have already

referred, from which it hoped to carve out approximately 410 acres for a "balefill"— that is, a landfill where the waste is baled before it is dumped. Approximately 298 acres of the proposed balefill site is what is known as an early successional stage forest. At one time, it was a strip mine, but when the mining operation shut down approximately 50 years ago, a labyrinth of trenches and other depressions remained behind. Over time, the land evolved into an attractive woodland vegetated by approximately 170 different species of plants. What were once gravel pits are now over 200 permanent and seasonal ponds. These ponds range from less than one-tenth of an acre to several acres in size, and from several inches to several feet in depth. The forest is also home to a variety of small animals. Most important for our purposes are the 100–plus species of birds that have been observed there. These include many endangered, water-dependent, and migratory birds. Among the species that have been seen nesting, feeding, or breeding at the site are mallard ducks, wood ducks, Canada geese, sandpipers, kingfishers, water thrushes, swamp swallows, redwinged blackbirds, tree swallows, and several varieties of herons. Most notably, the site is a seasonal home to the second-largest breeding colony of great blue herons in northeastern Illinois, with approximately 192 nests in 1993.

This litigation arose because the proposed balefill project would require the filling of approximately 17.6 acres of semi-aquatic property within the forested area. Section 404 of the Act prohibits the discharge of fill material into "the navigable waters" without a permit issued by the Secretary of the Army, acting through the Chief of Engineers. 33 U.S.C. § 1344(a). The term "navigable waters" is defined in the statute as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). Although the Act itself provides no further explanation of which waters are subject to § 404's requirements, regulations issued by the Environmental Protection Agency ("EPA") and the Corps

define the phrase "waters of the United States" to include "intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce." 33 C.F.R. § 328.3(a)(3).

In March 1986, SWANCC contacted the Corps to find out if a particular 267–acre parcel within the proposed balefill site included "wetlands" within the meaning of the Act, such that SWANCC would have to obtain a § 404 permit in order to fill it in. After an on-site inspection, the Corps initially decided that the site did not include protected wetlands and therefore did not fall within its regulatory jurisdiction. One year later, in February 1987, SWANCC contacted the Corps to request a determination as to whether a 414–acre parcel of the site included "wetlands." The Corps again responded in the negative.

The Corps changed its position with regard to its jurisdiction over the balefill site, however, after the Illinois Nature Preserves Commission (a state agency) informed it that a number of migratory bird species had been observed there. This new information made all the difference to the Corps, because of the so-called migratory bird rule. This rule, or interpretive convention, reflects the fact that the definition of "waters of the United States" found in 33 C.F.R. § 328.3(a)(3) has long been understood by the EPA and the Corps to include all waters, including those otherwise unrelated to interstate commerce, "which are or would be used as habitat by birds protected by Migratory Bird Treaties" or "which are or would be used as habitat by other migratory birds which cross state lines." 51 Fed.Reg. 41,206, 41,217 (1986) ("1986 preamble"). In a letter to SWANCC dated November 16, 1987, the Corps explained that its two previous determinations that the site did not fall within its jurisdiction were based on its

finding that the site did not meet the definition of "wetland." In contrast, the latest determination—that the Corps did have jurisdiction over the site—was based on a different theory entirely. Regardless of wetland status, it now appeared that the aquatic areas of the site "are or could be used as habitat by migratory birds which cross state lines." In response to the Corps' notification that it intended to exercise jurisdiction over the site, SWANCC submitted an application for a § 404 permit. The Corps denied that application, finding that all of the affected waters in the site were in fact used as habitat by migratory birds (and thus were not merely potential habitat). SWANCC then submitted a revised application that was also denied.

At this stage in the litigation, SWANCC has abandoned its challenge to the merits of the Corps' decisions and has instead focused exclusively on its challenge to the migratory bird rule as a basis for the Corps' jurisdiction. Accordingly, we accept as true the Corps' factual findings with regard to SWANCC's permit application, including the crucial finding that the waters of this site were a habitat for migratory birds.

## II

SWANCC offers three arguments to support its position that the Corps had no authority to require it to obtain a permit: (1) Congress lacked the power to grant the Corps regulatory jurisdiction over isolated, intrastate waters based on the presence of migratory birds alone; (2) the Corps exceeded its statutory authority in interpreting the Act to confer jurisdiction as provided by the migratory bird rule; and (3) the migratory bird rule is invalid because it was not promulgated in accordance with the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553.

■ We begin with the most ambitious of SWANCC's arguments, which is that the migratory bird rule is unconstitutional in light of the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Prior to *Lopez*, it had been established that Congress' powers under the Commerce Clause were broad enough to permit regulation of waters based on the presence of migratory birds. See, *e.g., Rueth v. EPA*, 13 F.3d 227, 231 (7th Cir.1993); *Leslie Salt Co. v. United States (Leslie I)*, 896 F.2d 354, 360 (9th Cir.1990). We must decide whether *Lopez* now compels the opposite conclusion.

In *Lopez*, the Court reaffirmed the well-established principle that a federal statute based on the Commerce Clause must serve one of three purposes: (1) regulation of the channels of interstate commerce; (2) regulation or protection of the instrumentalities of interstate commerce, or persons or things in interstate commerce; or (3) regulation of activities that "substantially affect" interstate commerce. *Lopez*, 514 U.S. at 558–59, 115 S.Ct. 1624; see also *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *United States v. Wilson*, 159 F.3d 280, 285 (7th Cir.1998). The gun control law at issue in *Lopez*, like the migratory bird rule challenged here, could only have been sustained as an exercise of the third variety of regulatory power. The *Lopez* Court concluded that the statute before it, which made it a crime "knowingly ... [to] possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone" did not meet the "substantially affects" test because (1) it was a criminal statute which, by its terms, had nothing to do with interstate commerce or commercial transactions; (2) it contained no jurisdictional element to ensure that in each case the firearm in question had in fact affected interstate commerce; and (3) Congress had offered no legislative findings to support the conclusion that possessing a gun in a school zone affected

interstate commerce. *Lopez*, 514 U.S. at 559–62, 115 S.Ct. 1624; see also *Wilson*, 159 F.3d at 286.

SWANCC urges us to conclude that the migratory bird rule suffers from the same defects. But such a conclusion would overlook important differences between the statute before the Court in *Lopez* and the one we are considering. This court has noted previously that *Lopez* expressly recognized, and in no way disapproved, the cumulative impact doctrine, under which a single activity that itself has no discernible effect on interstate commerce may still be regulated if the aggregate effect of that class of activity has a substantial impact on interstate commerce. *United States v. Hicks*, 106 F.3d 187, 189–90 (7th Cir.1997), citing *Lopez*, 514 U.S. at 561, 115 S.Ct. 1624; see also *United States v. Jones*, 178 F.3d 479 (7th Cir.1999); *United States v. Thomas*, 159 F.3d 296, 298 (7th Cir.1998).

This approach, which is most closely associated with the Supreme Court's decision in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), indicates the relevant legal question for our case is whether the destruction of the natural habitat of migratory birds in the aggregate "substantially affects" interstate commerce. We observed in *Hoffman Homes, Inc. v. EPA*, 999 F.2d 256 (7th Cir.1993), that "[t]hroughout North America, millions of people annually spend more than a billion dollars on hunting, trapping, and observing migratory birds. Yet the cumulative loss of wetlands has reduced the populations of many species and consequently the ability of people to hunt, trap, and observe those birds." *Id.* at 261. Statistics produced by the U.S. Census Bureau reveal that approximately 3.1 million Americans spent $1.3 billion to hunt migratory birds in 1996, and that about 11 percent of them traveled across state lines to do so. Fish & Wildlife Service, U.S. Dep't of the Interior & Bureau of the Census, U.S. Dep't of Commerce, 1996 National Survey of Fishing, Hunting, and Wildlife–Associated Recreation 25 (November 1997). Another 17.7 million people spent time observing birds in states other than their states of residence; 14.3 million of these took trips specifically for this purpose; and approximately 9.5 million traveled for the purpose of observing shorebirds, such as herons. *Id.* at 45. There is no need to dally on this point: we find (once again) that the destruction of migratory bird habitat and the attendant decrease in the populations of these birds "substantially affects" interstate commerce. The effect may not be observable as each isolated pond used by the birds for feeding, nesting, and breeding is filled, but the aggregate effect is clear, and that is all the Commerce Clause requires.

SWANCC objects that the migratory bird rule cannot serve to define the Corps' jurisdiction, because the rule excludes nothing. The United States is home to somewhere between 2.5 and 6 billion birds, two-thirds of which migrate. Virtually any body of water could serve as a temporary habitat for at least some of these birds. However, any suggestion that next the Corps will be trying to regulate the filling of every puddle that forms after a rainstorm, at least if a bird is seen splashing in it, misses the point. A "habitat" is not simply a place where a bird might alight for a few minutes, as SWANCC suggests, but rather "the place where a plant or animal species naturally lives or grows." Webster's Third New International Dictionary 1017 (1993). Before the Corps may assert jurisdiction under the migratory bird rule, it must first make a factual determination that a particular body of water provides a habitat for migratory birds, which it has done here.

Last, SWANCC offers a broad policy-based argument for rejecting jurisdiction under the migratory bird rule. The rule is, it claims, inconsistent with the principles of federalism that motivated the Court in *Lopez*, because it erodes the "distinction between what is truly national and what is truly local." *Lopez*, 514 U.S. at 567–68, 115 S.Ct. 1624. But this argument

works only if, as SWANCC asserts, the protection of migratory bird habitat is a matter of local concern only. Once again, that argument is refuted by the numerous international treaties and conventions designed to protect migratory birds, see, *e.g.*, Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, U.S.-Japan, 25 U.S.T. 3331, T.I.A.S. No. 7990 (1972); Convention for the Protection of Migratory Birds and Game Mammals, U.S.-Mex., 50 Stat. 1311, T.S. No. 912 (1936); Convention for the Protection of Migratory Birds, U.S.-Gr. Brit., 39 Stat. 1702, T.S. No. 628 (1916), as well as the case law recognizing the "national interest of very nearly the first magnitude" in protecting such birds, *North Dakota v. United States*, 460 U.S. 300, 309, 103 S.Ct. 1095, 75 L.Ed.2d 77 (1983); see also *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). Even less persuasive is SWANCC's suggestion that giving a federal agency (here, the Corps) the power to override decisions by local land use and zoning boards to permit the filling of local waters conflicts with notions of state sovereignty. To the contrary, because the regulation of migratory bird habitat is a permissible exercise of Congress' authority, the Supremacy Clause, U.S. Const. art. VI, cl. 2., squarely supports the legitimacy of giving precedence to federal law in this area.

## III

■ SWANCC next contends that, even if Congress lawfully could have granted the Corps jurisdiction over isolated bodies of water based on the presence of migratory birds, it did not do so. As noted above, the Act expressly limits the Corps' jurisdiction to "the waters of the United States." The EPA and the Corps have defined this term to include "[a]ll other waters ... the use, degradation or destruction of which could affect interstate or foreign commerce." They further have interpreted the phrase "could affect interstate or foreign commerce" as permitting

jurisdiction based on the presence of migratory birds. It is this second level of agency interpretation that SWANCC deems excessive.

■ We review an agency's interpretation of a statute it is charged with administering under the standard outlined in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The first question is whether the plain meaning of the text of the statute either supports or opposes the regulation. If so, the analysis ends with the court's application of the plain meaning. *Id.* at 842, 104 S.Ct. 2778. But if the statute is either ambiguous or silent on the issue, the court must defer to the agency interpretation so long as it is based on a reasonable reading of the statute. *Id.* at 843, 104 S.Ct. 2778.

■ It is well established that the geographical scope of the Act reaches as many waters as the Commerce Clause allows. See, *e.g.*, *Rueth*, 13 F.3d at 231; *United States v. Huebner*, 752 F.2d 1235, 1239 (7th Cir.1985); *United States v. Byrd*, 609 F.2d 1204, 1209 (7th Cir.1979). Thus, if Congress possesses the power to regulate a body of water under the Act, generally this court will conclude that it has in fact done so. Accordingly, because Congress' power under the Commerce Clause is broad enough to permit regulation of waters based on the presence of migratory birds, it is certainly reasonable for the EPA and the Corps to interpret the Act in such a manner. Accord *Leslie Salt I*, 896 F.2d at 360.

SWANCC believes that this conclusion is at odds with the Fourth Circuit's decision in *United States v. Wilson*, 133 F.3d 251 (4th Cir.1997). *Wilson* involved a challenge to 33 C.F.R. § 328(a)(3), the regulation that defines "waters of the United States" to include all waters "the use, degradation or destruction of which could affect interstate or foreign commerce." The court found the regulation to be an unreasonable interpretation of the Act based on

its suspicion that Congress lacks the power to regulate waters that "could" affect interstate or foreign commerce. In our case, however, the question whether Congress may regulate waters based on their *potential* to affect interstate commerce is not presented, because the unchallenged facts show that the filling of the 17.6 acres would have an immediate effect on migratory birds that actually use the area as a habitat. Thus, we need not, and do not, reach the question of the Corps' jurisdiction over areas that are only potential habitats. Moreover, we note that SWANCC has not attacked 33 C.F.R. § 328(a)(3) here. Instead, it has limited its objections to the propriety of the migratory bird rule as an interpretation of 33 C.F.R. § 328(a)(3).

■ SWANCC's remaining statutory interpretation argument asks us to find the migratory bird rule unreasonable because it is designed to preserve wildlife rather than water quality. This point overlooks the fact that the Act's stated purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). SWANCC's suggestion that the Corps' jurisdiction must be defined solely by reference to water quality is itself inconsistent with the Act and must be rejected.

## IV

■ Last, SWANCC challenges the migratory bird rule on the ground that it was promulgated in violation of the notice and comment requirements of the APA. See 5 U.S.C. § 553. Our starting point here is with the fact that the APA does not require administrative agencies to follow notice and comment procedures in all situations. Section 553(b)(3)(a) specifically exempts "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" from the requirement. In order to succeed on its APA claim, then, SWANCC must convince us that the migratory bird rule is a legislative (also termed "substantive") rule, rather than an interpretive rule or policy statement. See *Metropolitan Sch. Dist. of Wayne Township v. Davila*, 969 F.2d 485, 489–90 (7th Cir.1992); *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1566–67 (D.C.Cir.1984).

That, in our view, it cannot do. We explained the difference between legislative and interpretive rules at some length in *Hoctor v. U.S. Dept. of Agriculture*, 82 F.3d 165 (7th Cir.1996), where we found that a rule requiring certain wild animal containment fences to be eight feet tall was legislative. The reason for this was straightforward: nothing in the idea of a "secure" containment could tell someone whether 7½ feet, 8 feet, or 8½ feet, would be "secure" enough. The statute in question (the Animal Welfare Act, 7 U.S.C. § 2131 *et seq.*) did not impose a duty to build a fence of a certain height. Instead, it authorized the agency to impose a specific obligation that would implement the general statutory goals. Here, the statute itself defines the jurisdictional reach of the Act, and regulations issued under the notice-and-comment procedures have elaborated further upon that definition. There is, following *Hoctor*'s common-sense approach, something to interpret here: the use of the term "waters" and "navigable waters" in 33 U.S.C. §§ 1344(a) and 1362(7), and the specific examples of such waters given in 33 C.F.R. § 328.3(a)(3).

It is also noteworthy that the migratory bird "rule" first made its appearance in the Federal Register publication of the Corps' 1986 recodification of the regulatory definition of "waters of the United States" in 33 C.F.R. § 328(a)(3), when it moved these rules from Part 323 to Part 328 of Title 33 of the Code. See 51 Fed.Reg. 41206, 41217 (1986). The preamble offered several examples of waters that came within the regulatory definition, including those used as habitat for migratory birds, as well as examples of waters that normally would not fall within the definition. This, in our view, was interpretation. Moreover, it is hard to see what would have been different

if formal notice-and-comment rulemaking had been used, except perhaps the page of the Federal Register on which this statement appeared. We do not wish to discourage agencies from offering concrete examples of the ways in which their rules will apply, see *Hoctor*, 82 F.3d at 170, and we believe that is all that the Corps and the EPA did here.

The Corps has also argued that SWANCC's challenge to the migratory bird rule comes too late, because SWANCC did not file suit in the district court until December 1994, more than six years after the migratory bird rule was first published. There is a general six-year statute of limitations for civil actions against the United States found in 28 U.S.C. § 2401(a), which applies to lawsuits brought pursuant to the APA. See *Polanco v. United States Drug Enforcement Admin.*, 158 F.3d 647, 652 (2d Cir.1998); *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir.1997); see also *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 331 (7th Cir.1993) (recognizing cases holding same, but not expressly reaching the issue). Even if the fact that the Corps did not raise this argument in the district court does not bar it now from making the argument, we doubt that a party must (or even may) bring an action under the APA before it knows that a regulation may injure it or even be applied to it. Compare *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (claim under the Federal Tort Claims Act accrues at the time plaintiff knows of both the existence and cause of his injury). We therefore do not reach the Corps' limitations argument, since it would have no effect on the outcome in light of our resolution of SWANCC's substantive APA challenge.

We conclude that the decision to regulate isolated waters based on their actual use as habitat by migratory birds is within Congress' power under the Commerce Clause, and that it was reasonable for the Corps to interpret the Act as authorizing this regulation. Accordingly, we AFFIRM the judgment of the district court.