AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 2119; Tony Carnes; Katherine Cruz; Randall L. Engle; David Garrison; Daniel Hendrickx; Lowell Herrick, Jr.; DeWayne R. Lamp; Michael Luckey; Robert O. Morris; and Barbara Painter, Plaintiffs,

v.

William S. COHEN, Secretary of Defense, et al., Defendants,

and

General Dynamics Land Systems, Inc., Defendant–Intervenor.

No. 97–4020.

United States District Court, C.D. Illinois.

Aug. 23, 2000.

Mr. Kevin M. Grile, American Federation of Government Employees, AFL–CIO, Chicago, IL, for plaintiff.

Mr. Oliver J. Larson, Mr. Craig C. Martin, Jenner & Block, Chicago, IL, for General Dynamics Land Systems, Inc.

### *ORDER*

MIHM, District Judge.

Now before the Court are a Motion for Summary Judgment by Plaintiffs and a Motion for Summary Judgment by the Federal Defendants, in which General Dynamics Land Systems, Inc. ("General Dynamics") has joined. For the reasons set forth below, Plaintiffs' Motion for Summary Judgment [# 48] is DENIED, and the Federal Defendants' Motion for Summary Judgement [# 60] is GRANTED.

## FACTUAL BACKGROUND

The individual Plaintiffs are present or former civilian employees of the Department of the Army working at the Rock Island Arsenal (the "Arsenal") in Rock Island, Illinois. Plaintiff American Federation of Government Employees Local 2119 is certified as the exclusive labor representative for the bargaining unit of wage grade civilian employees at the Arsenal, including the individual Plaintiffs. According to Plaintiffs, there has been a reduction in civilian job positions at the Arsenal over the last several years due to a lack of workload. This reduction in force has resulted in certain civilian employees either being separated from federal employment or involuntarily placed in lower graded positions.

The Arsenal is owned by the United States, and the Federal Defendants are officials and/or officers of the United States Government. Plaintiffs brought suit against the Federal Defendants contending that the reductions in force were caused by one or more of their decisions to award two defense projects to General Dynamics and another private contractor in violation of certain procurement and contracting statutes, as well as the Arsenal Act. Specifically, Plaintiffs allege that the Department of the Army erred in allowing certain tank gun mounts and new ultralight howitzers to be produced by private contractors without a cost comparison showing that production at a Government-owned facility could not be done on an economical basis.

The Court previously dismissed this case for lack of standing. On appeal, the Seventh Circuit affirmed the dismissal with respect to the identified procurement and contracting statutes, but remanded for consideration under the Arsenal Act. *American Federation of Government Employees v. Cohen*, 171 F.3d 460 (7th Cir. 1999). Both Plaintiffs and the Federal Defendants have now moved for summary judgment, and General Dynamics has joined in the Federal Defendants' motion.

The motions are fully briefed and ready for resolution. This Order follows.

## LEGAL STANDARD

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 2553. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.*, 106 S.Ct. at 2553. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson*, 106 S.Ct. at 2511.

## DISCUSSION

The Arsenal Act provides:

The Secretary of the Army shall have supplies needed for the Department of

the Army made in factories or arsenals owned by the United States, so far as those factories or arsenals can make those supplies on an economical basis. 10 U.S.C. § 4532(a). This statute "appears to be aimed at preserving the government's in-house military production capabilities." *American Federation*, 171 F.3d at 473.

When reviewing an agency's interpretation of a statute that it is charged with administering under the Administrative Procedure Act, the Court is guided by the standard outlined in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and may set aside the agency action only if it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *United States v. Dierckman*, 201 F.3d 915, 923 (7th Cir.2000), *citing* 5 U.S.C. § 706(2)(A) (1999); *Solid Waste Agency of N. Cook County v. United States Army Corps of Engineers*, 191 F.3d 845, 851 (7th Cir. 1999). The *Chevron* analysis starts with the language of the statute itself, and if "'the plain meaning of the text of the statute either supports or opposes the regulation,' then inquiry ends, and this court applies the statute's plain meaning." *Dierckman*, 201 F.3d at 923, *citing Solid Waste Agency*, 191 F.3d at 851. If the statute is either silent on the issue or ambiguous, then "'the court must defer to the agency interpretation so long as it is based on a reasonable reading of the statute.'" *Id.*

#### I. *Mandatory Nature of Statute*

Defendants argue that Plaintiffs are entitled to no relief under the Arsenal Act because the language of the statute is permissive rather than mandatory. However, the plain language of the statute opposes this interpretation. *Dierckman*, 201 F.3d at 923, *citing Solid Waste Agency*, 191 F.3d at 851.

"[W]hen resolving a dispute over the meaning of a statute, we look to the stat-

ute itself to determine whether the statute is plain and unambiguous with regard to the dispute." *Connor v. Commissioner of Internal Revenue*, 218 F.3d 733, 740 (7th Cir.2000). Courts are required to give effect to the "clear meaning" of statutes as written, and to the extend that "a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475–76, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). With this basic principle of construction in mind, the Court finds no ambiguity with respect to the mandatory nature of the statute as applied to the Secretary's acquisition of "supplies needed for the Department of the Army." The plain language of § 4532(a) states that the Secretary of the Army "shall" have such supplies made in factories or arsenals if they can be made on an economical basis. Furthermore, the language of a joint policy statement dated July 7, 1992, entitled "Army Industrial Manufacturing Policy" reveals that the Army in fact acknowledged the primarily mandatory nature of the Arsenal Act in stating that "[t]he Secretary of the Army *is required* to have such supplies manufactured in Government facilities so far as those facilities can make those supplies on an economical basis." AR 2769 (emphasis added.) *See also*, Opinion Letter from the Comptroller General of the United States dated December 15, 1960 at 5 (finding that "the word 'shall' was intended to make it mandatory upon the War Department to use Government arsenals and Government-owned factories" where it would be economical to do so.)

The mandatory nature of the Army's Arsenal Act seems even more clear when contrasted with the parallel statute applicable for the Air Force, which states:

The Secretary of the Air Force *may* have supplies needed for the Department of the Air Force made in factories, arsenals, or depots owned by the United States, so far as those factories, arse-

nals, or depots can make those supplies on an economical basis.

10 U.S.C. § 9532 (emphasis added). Although § 9532 originally had the same mandatory "shall" language as the Army Arsenal Act, the Air Force statute was subsequently amended to change the word "shall" to "may" in 1951, after the Secretary of the Air Force successfully persuaded Congress that the statute's directives should be permissive rather than mandatory in recognition of a period of great expansion in the Air Force. Senate Report No. 426, 1951 U.S.C.C.A.N. 2192, 2197. Had Congress intended to apply the same standard to the Army via § 4532, it would have been simple enough to amend the language when both acts were re-examined and re-codified in 1956. Yet the word "shall" has remained unchanged in § 4532 to this day, and Defendants' argument that § 4532 is plainly permissive to the point that it is essentially unreviewable must be rejected.

## II. *Remaining Requirements of the Statute*

The fact that the Court has determined that the word "shall" is plainly mandatory in nature does not end the Court's inquiry, however, as the remainder of the statutory language, including the statute's scope and applicability, is not as clear. For example, the Act applies to "supplies," but the term is not specifically defined and any definition that could be inferred would be subject to various interpretations. Although the change from the former "all supplies" language to simply "supplies" seems to indicate the intent that the statute apply to some quantity less than "all supplies," the Court finds ambiguity as to what category of items or products are included within the scope of the Act.[1] *See* AR 1512 (noting

that "supplies" is not defined in the Arsenal Act and has not been defined by the Comptroller General.) Similarly, § 4532 requires production at arsenals where it can be done on "an economical basis." 10 U.S.C. § 4532(a). While it seems clear enough that in exercising his authority pursuant to the statute, the Secretary of the Army must generally perform some sort of cost analysis with respect to the "supplies needed," there is no guidance, criteria, or direction indicating how such an analysis should be performed, rendering the precise requirements of the statute ambiguous in this respect as well. Thus, despite the mandatory language in the statute, the Arsenal Act as written appears to vest the Secretary of the Army with discretion to determine whether the statute in fact applies to a given situation, what "supplies" fall within its scope, and how the requirements of the Act are to be implemented.

Where a statute "is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute, that is whether the agency's construction is rational and consistent with the statute." *330 West Hubbard Restaurant Corp. v. United States,* 203 F.3d 990, 995 (7th Cir.2000), *citing Sullivan v. Everhart,* 494 U.S. 83, 89, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990); *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. "In other words, so long as the agency has set out a reasonable interpretation, it does not matter whether, in the first instance, we would have come to the same conclusion." *City of Chicago v. Federal Communications Commission,* 199 F.3d 424, 428 (7th Cir. 1999).

---

1. Although the 1956 recodification of this statute indicated that the object of the recodification was "to restate existing law, not to make new law," it also noted that [a]dherence to the substance of existing law, however, has not always meant adherence to the letter of the statute. Where court decisions, opinions of officials such as the Attorney General or the Comptroller General, executive orders, regulations, or well-established administrative practice have established authoritative interpretations clarifying ambiguities in the law, the text has been reworded to express those interpretations. Senate Report on H.7049, 1956 U.S.C.C.A.N. 4613, 4640.

### A. Gun Mounts for Tank Upgrade Program

Plaintiffs argue that upon the closing of the Detroit Army Tank Plant ("DATP") in the Base Closure and Realignment Act of 1995, the portion of the production of gun mounts that was being done at DATP should have been transferred to the Arsenal and could not have been transferred to the contractor owned-contractor operated facility of General Dynamics without an Arsenal Act cost study showing that production at the Arsenal could not be done on an economical basis.[2]

Defendants contend that the production of these tank mounts is not governed by the Arsenal Act, as the statute does not apply to Army supply requirements under solicitations pursuant to sole source contracts. Specifically, Defendants maintain that the Army entered into a sole source contract with General Dynamics for an entire tank upgrade program, of which the gun mounts at issue are only one of many component parts included within the program. See AR 47–62 (setting forth the justification and approval of the contract with General Dynamics as a sole source contract under 10 U.S.C. § 2304(c)(1).) General Dynamics broke out several portions of this work as feasible for competitive production, but retained the remainder of the work for itself and chose to perform some of this work at the DATP; however, General Dynamics was under no obligation to utilize the DATP for this process.

In support of their interpretation of the Arsenal Act, Defendants point to a July 20, 1992, joint policy statement entitled "Army Industrial Manufacturing Policy." This policy provides:

> The Army Arsenal Statute will be implemented through make/buy decisions in preference to head-to-head competitions with private industry using formal solicitations.

> \*   \*   \*   \*   \*   \*

> PEOs, PMs, and AMC MSCs will consider manufacturing capacity available in Army facilities before issuing solicitations for manufacture of supplies. This will normally be part of an overall make/buy decision which considers all compelling reasons for in-house performance. If in-house performance is not otherwise required and authorized, the out-of-pocket cost to produce the item in the Government facility will be compared with an estimate of the total cost to produce the item in private industry, without issuing a solicitation.

> \*   \*   \*   \*   \*   \*

> If in-house manufacturing resources are considered most economical based on the out of pocket cost, the supply requirement will be assigned to the Government facility.... If the decision is to procure from private industry, a Government facility will not participate as a bidder or offeror under the instant solicitation for the supplies.

> \*   \*   \*   \*   \*   \*

> The commanders of the acquiring MSC and the MSC that oversees the applicable industrial facility, and, for PEO programs, the PEO or PM ... will ensure joint review of requirements for supplies for possible performance by Army manufacturing facilities. The decision to make or buy will be jointly approved by the MSC commanders and the PEO/PM or AMC PM/MM.

> \*   \*   \*   \*   \*   \*

> The Army Arsenal Statute does not apply to Army supply requirements under solicitations restricted to particular sources. The Arsenal Statute thus does not affect the ability to award supply contracts to particular suppliers in the private industrial base to maintain their

2. In this respect, it is important to note that Plaintiffs do not challenge the original award of the single source contract to General Dynamics.

availability in the event of national emergency or industrial mobilization, pursuant to industrial preparedness policy. AR 2769–70, 2775. Thus, this policy purports to memorialize certain subsets of supplies, relationships, or contracts that are excepted from the scope of the Arsenal Act by other applicable procurement statutes, as well as a mechanism for conducting the cost analysis required if the provisions of the Arsenal Act are deemed applicable.

This approach is further developed in a June 6, 1995, Draft Regulation on the Procedure to Make or Buy Supplies and Services. AR 2851. A distinction is drawn between components, which are separately procured to support an end item, and the end items themselves. AR 2581, 2865. Items where the primary criteria for selection are technical or design rather than cost, items that are restricted to a particular source of supply pursuant to a statutory exception to the requirement for full and open competition, supplies that have been procured through set-asides for small or disadvantaged businesses, items that require advance design approval, prospective procurement actions of less than $100,000.00, and supplies that are covered by existing multi-year or requirements contracts are listed as not appropriate for make or buy evaluation. AR 2853–54, 2867–68.

Again, after having been amended from "all supplies" to merely "supplies", the Arsenal Act in its present form appears to afford discretion to the Secretary to determine what "supplies" come within the scope of the statute. In exercising this discretion, it would only be reasonable to consider the particular needs of the Army and look to other related regulations or statutes for guidance. Here, the Secretary has drawn from the 1950 version of the Arsenal Act, which contained the broader "all supplies" language yet explicitly stated that even with the more inclusive language, Congress intended that the Arsenal Act "not replace or modify the provisions of the Armed Services Procurement Act of 1947," which acknowledged an exception to normal procurement procedures for the sole source provision invoked in the Army Industrial Manufacturing Policy.

The Court also notes that in the present version of the armed services procurement statute, which became codified at 10 U.S.C. § 2304 in 1956, Congress expressly recognizes exceptions to normal procurement procedures when:

(a) the property or services needed by the agency are available from only one responsible source or only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency; (2) the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals; (3) it is necessary to award the contract to a particular source or sources in order (A) to maintain a facility, producer, manufacturer, or other supplier available for furnishing property or services in case of a national emergency or to achieve industrial mobilization, (B) to establish or maintain an essential engineering, research, or development capability to be provided by an educational or other nonprofit institution or a federally funded research and development center, or (C) to procure the services of an expert for use, in an litigation or dispute (including any reasonably foreseeable litigation or dispute) involving the Federal government, in any trial, hearing, or proceeding before any court, administrative tribunal, or agency, or to procure the services of an expert or neutral for use in any part of an alternative dispute resolution or negotiated rulemaking process, whether or not the expert is expected to testify . . .

10 U.S.C. § 2304(c).

■ In light of the exceptions to normal procurement procedures recognized by

Congress in both the Armed Services Procurement Act of 1947 and the current procurement statute, the Court cannot find that the Army's policy of incorporating these same exceptions into its procurement procedures and policies implementing the Arsenal Act is either an unreasonable construction of the statute or inherently inconsistent with the plain language of the statute. Thus, the Army's determination that General Dynamics was the only entity with the capability and resources necessary to perform the entire tank upgrade program and the issuance of the resultant sole source contract were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

This conclusion is further supported by an opinion letter from the Comptroller General of the United States dated December 15, 1960, in which the Comptroller General opines that where an inconsistency should arise between the directives of the Arsenal Act and those contained in the Armed Services Procurement Act, the Armed Services Procurement Act should control and authorize the Secretary "to negotiate a contract with a particular supplier in the interest of national defense and industrial mobilization, notwithstanding the existence of other private or Government-owned production facilities." Opinion Letter at 8.[3] Thus, the Comptroller General has also acknowledged an exception to the Arsenal Act's requirements for sole source contracts. Even the November 6, 1995, Memorandum from AMC Associate Counsel Paul Harrington, upon which Plaintiffs rely to suggest that the Army had previously acknowledged the applicability of the Arsenal Act to the gun mount production, states that "the Arsenal Statute will not apply if an award to GDLS is justified on an independent statutory basis, such as a properly applicable exception to

the full and open competition under the Competition in Contracting Act." AR 1379.

Moreover, there is nothing in the language of the Arsenal Act that indicates that the Secretary is bound to perform a cost comparison on each and every nut, bolt, screw, or other component part of any end product or system that is produced or manufactured for the Army.[4] The Inspector General's Office, in conducting an audit of the Army's procurement of gun mounts for the tank upgrade project, concurred with this observation in finding:

> [T]he Arsenal Act does not require the Army to evaluate every component of a system purchased from private industry to determine whether the components could be economically manufactured by an arsenal and provided to the system prime contractor as Government-furnished material.

AR 1432. Consequently, there is nothing on the face of the statute that required a cost analysis for the gun mounts to the extent that they were included and subsumed within the sole source contract with General Dynamics for the production of the entire tank upgrade program, and it was determined at the time the contract was executed that no other entity could have timely performed the contract for the entire tank upgrade program itself. AR 47–62. Plaintiffs' efforts to arbitrarily parse the contract into its various component parts in an attempt to bolster their position are simply unpersuasive.

However, at some point in 1982, the Army and General Dynamics responded to an increased demand for the upgraded tanks with the decision to transfer the manufacture of 50 percent of the gun mounts from the contract with General Dynamics (which happened to be produced

---

**3.** Plaintiffs acknowledge that this Opinion Letter is the "lead decision interpreting the requirements of the Arsenal Act." Memorandum in Support of Plaintiff's Motion for Summary Judgment at 10.

**4.** A requirement that each and every component part of an end product be separately subjected to an Arsenal Act cost analysis defies common sense and would likely result in an administrative logjam that would bring the Army's purchasing to a grinding halt.

using the facilities at the DATP) to the Government-owned, Government-operated facility at the Arsenal; this 50 percent of the production would thereafter be provided separately to the contractor as Government-furnished material for the tank upgrade project.[5] AR 1381–82, 1432–34, 1440–1443, 1513. From that point on, the Court finds that the portion of the gun mounts to be produced separately at the Arsenal and provided as Government-furnished material became subject to the Arsenal Act, a fact which is implicitly acknowledged in the Army's response to the Inspector General's audit on this topic.

> If the Army acquisition strategy decision is to purchase a component on other than a system prime contractor approach, then the Arsenal Act is applied to the resulting decision that must be made by the Government of where to purchase the component. The Arsenal Act is considered only after an acquisition strategy decision has been made to acquire a component separately.

AR 1432; *see also,* AR 1443. The Army then stated that it was in the process of reevaluating its 1982 acquisition strategy decision, thereby implicitly acknowledging that the 1982 decision to obtain 50 percent of the gun mounts separately from the Arsenal was in fact an acquisition strategy decision that could trigger the application of the Act. *Id.*

Once the decision was made to treat 50 percent of the gun mounts as a separate item of supply, the Arsenal Act was implicated with respect to the portion of the gun mounts that were to be made separately at the Arsenal as Government-furnished supplies, and any decision to remove those items from production could not be done without an Arsenal Act cost analysis indicating that it was no longer economical to manufacture that portion of the gun mounts within the arsenal system. *See* AR 1513 (recommending that "[t]he gun mounts produced at Rock Island and provided to the contractor as Government-furnished material should be considered a 'supply' covered by the Arsenal Act.") The remaining 50 percent of the gun mounts would have remained exempt from the requirements of the Arsenal Act, as they continued to be produced as part of the complete tank upgrade program under the single source contract with General Dynamics.[6] *Id.*

As it was the Army's decision with respect to the gun mounts being produced directly by General Dynamics that is being challenged in this case, the Court must conclude that the gun mounts produced under General Dynamics' sole source contract for the tank upgrade program were exempt from the scope of the Arsenal Act, and the Secretary's decision with respect to the production of these products in the wake of the DATP closure will not be disturbed.

In summary, while it is easy to get bogged down in technical terminology and semantics, this case is not as difficult as the parties represent it to be, as many of the arguments proffered are simply not material to the issue before the Court. Essentially, the single source contract to General Dynamics for the entire tank upgrade program, which Plaintiffs make no real effort to challenge, was issued pursuant to a statutory exception to normal

---

**5.** The remaining 50 percent of the gun mounts would be continue to be produced by the contractor at DATP pursuant to the single source contract.

**6.** Contrary to Plaintiffs' position, the 50 percent of the gun mounts being manufactured by General Dynamics were not component parts being produced separately in the arsenal system. The Administrative Record clearly establishes that they were included within the specifications of the sole source contract for the complete tank upgrade program and were being produced directly by General Dynamics for its use in the upgrade program. The fact that General Dynamics happened to select the DATP as the location for General Dynamics to perform part of this work does not convert the terms of the contract or change these gun mounts into Government-furnished materials.

procurement procedures and therefore fell outside the scope of the Arsenal Act. Although a portion of the gun mounts originally included within that contract were subsequently separated out for production at the Arsenal as Government-furnished supplies and thus came within the purview of the Act, the remainder of General Dynamics' contract work on the program remained exempt from the application of the Arsenal Act. Thus, Plaintiffs' challenge to the production of the portion of the gun mounts that were being produced at DATP, which remained exempt under the sole source contract with General Dynamics, is without merit.

## II. *Ultra–Light Howitzers*

The Lightweight 155mm Towed Howitzer Program is a joint program between the Army and U.S. Marine Corps, with the Marine Corps as the "lead service." AR 1711. A bit of background information is helpful to understand this relationship.

In the late 1980s and early '90s, two private industry contractors initiated in-house efforts at their own expense to develop a towed 155mm howitzer that weighed less than 9000 lbs. AR 2797. Vickers Shipbuilding and Engineering Limited and Royal Ordnance then entered into license agreements with the Government in 1988 and 1990 respectively. *Id.* Each provided a prototype for testing and evaluation based on Marine Corps' requirements. *Id.* On May 27, 1993, the Marine Corps published a Mission Needs Statement for the LW155 howitzer, in which the Army joined in December 1994. *Id.* Hoping to take advantage of the technology that was being developed by the two contractors in order to cut down on both costs and time spent in research and development, the Army announced a market survey for a LW155mm howitzer project in the *Commerce Business Daily.* AR 2186, 2801–08. This survey directed interested participants to submit capabilities statements to ARDEC. *Id.* No indication of interest was received directly from any

government activity as a result of the market survey. AR 1712. The Navy authorized and approved funding for the transition of this preliminary process into a "Concept Exploration and Definition" demonstration phase on February 3, 1995. AR 2797.

On June 19, 1995, the Army's Armament Research, Development, and Engineering Center ("ARDEC") issued a draft solicitation to obtain comments from industry on the future production of a new 155 mm howitzer. AR 1712. The Arsenal responded to this draft solicitation with a letter dated July 28, 1995, indicating that the Arsenal would be "very interested in this acquisition." AR 2630. After completing a Cost Operational and Effectiveness Analysis in January 1996, a second draft solicitation was issued. AR 2797. In response to the second draft solicitation, the Arsenal responded with a request that the solicitation specifically state that subcontracting with Department of Defense facilities is permissible under 10 U.S.C. § 2208(j). AR 2633. This request was granted, and a formal request for proposals issued in April 1996.

After receiving the draft solicitations and obtaining the requested change in the language of the solicitation, the Arsenal apparently continued to work on a prototype howitzer. In mid-April 1996, the Arsenal entered into an arrangement with Lewis Machine & Tool Company ("Lewis"), whereby Lewis would enter the shoot-off competition through which prototype howitzers would be selected for further development and possible production. Lewis then entered the prototype that had been developed by the Arsenal in the competition. However, the Army subsequently determined that Lewis essentially had nothing to do with the development and production of the prototype, but rather that the Arsenal's role was "of such an overwhelming nature as to make it the *de facto* prime contractor under the Lewis submission." AR 2745, 2748, 2777. Stated another way, the Arsenal:

[K]new that they were ineligible to compete as a prime contractor, yet they established a relationship in which they would essentially be the prime. This relationship is against the principles of acquisition reform and against DA policy concerning "head-to-head" competition between the government and private industry.... [The Arsenal] negotiated subcontracting relationships with the other competitors and failed to inform them, and in at least one case denied, that they had a weapon for the shoot-off.... [A]t a minimum, there is the appearance of bad faith.

AR 2745–46, 2748, 2777.

Carmine Spinelli ("Spinelli"), the Technical Director for ARDEC, determined that the prototype howitzer submitted by Lewis had actually been developed by the Arsenal in conjunction with a separate "fire-out-of-battery" project that had previously been funded by ARDEC and the Army Research Laboratory; permission to enter this prototype in response to the request for proposals for the howitzer project was neither requested by the Arsenal nor authorized by ARDEC. AR 2782, 2846. In fact, when the Arsenal requested additional funding to complete the prototype in March 1996, Spinelli specifically stated that the funding would be approved, but that the prototype could not be used by a government agency to compete against private industry for the LW155 howitzer project. AR 2782.

Be that as it may, the question of whether the decision to disqualify Lewis as a competitor was right or wrong is not before the Court. The real issue is why or how it was determined that the LW155 howitzer project would be offered to a prime contractor from private industry rather than the Arsenal, which had apparently been developing related technology through other contracts or projects; it is in this context that the Plaintiffs claim that there has been a violation of the Arsenal Act.

The answer to this question lies in the November 3, 1995, Memorandum of Agreement ("MOA") Between the Assistant Secretary of the Navy (Research, Development and Acquisition) ("ASN (RDA)") and the Assistant Secretary of the Army (Research, Development and Acquisition) ("ASA (RDA)") for the Lightweight 155 MM Towed Howitzer. AR 2789. This MOA provides:

The LW155 is currently a unilaterally funded program, managed by a Joint Program Office (U.S. Marine Corps and U.S. Army personnel) as established in this MOA.... As the Lead Service acting under the guidance of the ASN (RDA), the U.S. Marine Corps, represented by the COMMARCORSYSCOM [Commander, Marine Corps Systems Command], has the authority to direct the program under the policies and procedures set forth in Department of Defense (DoD) and Department of the Navy acquisition regulations. The PEO–FAS [designated by the ASA (RDA) as the Army Executive Agent for the LW155 project] will execute the program per the decisions and direction of the COMMARCORSYSCOM and the ASN (RDA).

AR 2789, 2795. The Marine Corps, as the "Lead Service," retains authority for all funds designated for the project, while the Army, as a "Participating Service," will receive and execute funds from the COMMARCORSYSCOM, as well as execute all contracting actions for the Marine Corps. AR 2790–91, 2795; *see also,* AR 1711 (noting that "[t]he Navy Acquisition Executive is the Milestone Decision Authority and ... [t]he Commander, Marine Corps Systems Command provides program direction and funding.")

■ This MOA clearly indicates that the howitzer program is unilaterally funded by the Navy/Marine Corps., and that the Army is merely a participating service. It further establishes that the Navy/Marine Corps has the full authority to direct the program in accordance with Department of

Defense and Navy acquisition regulations; there is no indication that the Navy intended to subject itself to any acquisition regulations applicable solely to the Army or delegated final decision-making authority to the Army. Rather, the participating personnel from the Army are merely to execute the decisions and directives made by the Navy/Marine Corps per the COMMARCORSYSCOM and the ASN (RDA). *See also*, AR 2797 (noting that the MOA stipulates how the Army will support the Marine Corps lead on the LW155 program.) Under these circumstances, the Court must find that the requirements of the Army Arsenal Act have no applicability to the Navy's ultimate decision to contract with private industry for the engineering and development of LW155 howitzers for future production.[7] As a review of the administrative record and the pleadings in this case does not reveal an agency action that was based on an unreasonable interpretation of the statute, Plaintiffs are not entitled to the relief requested, and Defendants are entitled to judgment as a matter of law.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment [# 48] is DENIED, and the Federal Defendants' Motion for Summary Judgment [# 60] is GRANTED. This matter is now terminated.

7. A review of the record would seem to indicate that no final production contract has yet been awarded. In fact, in a December 1999 Report to Congress on the LW155mm howitzer project, the Marine Corps and Army repeatedly state that the Arsenal's expertise and experience has been and will continue to be utilized as the program completes development and enters production and that the Arsenal will be given the opportunity to compete with industry for the production phase of the project. Exhibit 1 to Memorandum of Law in Support of Federal Defendants' Motion for Summary Judgment at 3–4, 9–10, 12–14.