## SOLID WASTE AGENCY OF NORTHERN COOK COUNTY *v.* UNITED STATES ARMY CORPS OF ENGINEERS ET AL.

No. 99–1178.   Argued October 31, 2000—Decided January 9, 2001

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 174.

*Timothy S. Bishop* argued the cause for petitioner. With him on the briefs were *Kaspar J. Stoffelmayr, Sharon Swingle,* and *George J. Mannina, Jr.*

*Deputy Solicitor General Wallace* argued the cause for respondents. With him on the brief for the federal respondents were *Solicitor General Waxman, Assistant Attorney General Schiffer, Malcolm L. Stewart,* and *John A. Bryson. Myron M. Cherry* filed a brief for respondents Village of Bartlett et al.*

*Briefs of *amici curiae* urging reversal were filed for the State of Alabama by *Bill Pryor,* Attorney General, *Alice Ann Byrne,* Assistant Attorney General, and *Jeffrey S. Sutton;* for the American Farm Bureau Federation et al. by *William G. Myers III;* for Arid Operations, Inc., by *Charles L. Kaiser;* for Cargill, Inc., by *Leslie G. Landau, Edgar B. Washburn,* and *David M. Ivester;* for the Cato Institute et al. by *Theodore M. Cooperstein, William H. Mellor, Clint Bolick, Scott G. Bullock, Timothy Lynch, Robert A. Levy,* and *Ronald D. Rotunda;* for the Center for the Original Intent of the Constitution by *Michael P. Farris* and *Scott W. Somerville;* for the Chamber of Commerce of the United States by *Robert R. Gasaway, Jeffrey B. Clark, Daryl Joseffer,* and *Robin S. Conrad;* for the Claremont Institute Center for Constitutional Jurisprudence by *Edwin Meese III;* for Defenders of Property Rights by *Nancie G. Marzulla;* for the National Association of Home Builders by *Thomas C. Jackson;* for the Nationwide

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Section 404(a) of the Clean Water Act (CWA or Act), 86 Stat. 884, as amended, 33 U. S. C. § 1344(a), regulates the discharge of dredged or fill material into "navigable waters." The United States Army Corps of Engineers (Corps) has interpreted § 404(a) to confer federal authority over an abandoned sand and gravel pit in northern Illinois which provides habitat for migratory birds. We are asked to decide whether the provisions of § 404(a) may be fairly extended to these waters, and, if so, whether Congress could exercise such authority consistent with the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3. We answer the first question in the negative and therefore do not reach the second.

Petitioner, the Solid Waste Agency of Northern Cook County (SWANCC), is a consortium of 23 suburban Chicago

Public Projects Coalition et al. by *Lawrence R. Liebesman;* for the Pacific Legal Foundation et al. by *Anne M. Hayes* and *M. Reed Hopper;* for the Serrano Water District et al. by *Virginia S. Albrecht* and *Stephen J. Wenderoth;* for the Washington Legal Foundation et al. by *Mark A. Perry, Daniel J. Popeo,* and *Paul D. Kamenar;* for the U. S. Conference of Mayors et al. by *Richard Ruda* and *James I. Crowley;* and for James J. Wilson by *Steven A. Steinbach* and *Gerald A. Feffer.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Richard M. Frank,* Chief Assistant Attorney General, *J. Matthew Rodriguez,* Senior Assistant Attorney General, *Dennis M. Eagan,* Supervising Deputy Attorney General, and *Joseph Barbieri,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Thomas J. Miller* of Iowa, *Andrew Ketterer* of Maine, *John J. Farmer, Jr.,* of New Jersey, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *William H. Sorrell* of Vermont, and *Christine O. Gregoire* of Washington; for the Anti-Defamation League et al. by *Martin E. Karlinsky, Steven M. Freeman, Michael Lieberman,* and *Elliot M. Mincberg;* and for Environmental Defense et al. by *Louis R. Cohen* and *Michael Bean.*

Briefs of *amici curiae* were filed for the American Forest & Paper Association et al. by *Russell S. Frye;* for the Center for Individual Rights by *Michael E. Rosman;* for the National Stone Association by *Kurt E. Blase;* and for Dr. Gene Likens et al. by *Michael Bean.*

cities and villages that united in an effort to locate and develop a disposal site for baled nonhazardous solid waste. The Chicago Gravel Company informed the municipalities of the availability of a 533-acre parcel, bestriding the Illinois counties Cook and Kane, which had been the site of a sand and gravel pit mining operation for three decades up until about 1960. Long since abandoned, the old mining site eventually gave way to a successional stage forest, with its remnant excavation trenches evolving into a scattering of permanent and seasonal ponds of varying size (from under one-tenth of an acre to several acres) and depth (from several inches to several feet).

The municipalities decided to purchase the site for disposal of their baled nonhazardous solid waste. By law, SWANCC was required to file for various permits from Cook County and the State of Illinois before it could begin operation of its balefill project. In addition, because the operation called for the filling of some of the permanent and seasonal ponds, SWANCC contacted federal respondents (hereinafter respondents), including the Corps, to determine if a federal landfill permit was required under § 404(a) of the CWA, 33 U. S. C. § 1344(a).

Section 404(a) grants the Corps authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Ibid.* The term "navigable waters" is defined under the Act as "the waters of the United States, including the territorial seas." § 1362(7). The Corps has issued regulations defining the term "waters of the United States" to include

> "waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce . . . ."
> 33 CFR § 328.3(a)(3) (1999).

In 1986, in an attempt to "clarify" the reach of its jurisdiction, the Corps stated that §404(a) extends to instrastate waters:

"a. Which are or would be used as habitat by birds protected by Migratory Bird Treaties; or

"b. Which are or would be used as habitat by other migratory birds which cross state lines; or

"c. Which are or would be used as habitat for endangered species; or

"d. Used to irrigate crops sold in interstate commerce." 51 Fed. Reg. 41217.

This last promulgation has been dubbed the "Migratory Bird Rule."[1]

The Corps initially concluded that it had no jurisdiction over the site because it contained no "wetlands," or areas which support "vegetation typically adapted for life in saturated soil conditions," 33 CFR §328.3(b) (1999). However, after the Illinois Nature Preserves Commission informed the Corps that a number of migratory bird species had been observed at the site, the Corps reconsidered and ultimately asserted jurisdiction over the balefill site pursuant to subpart (b) of the "Migratory Bird Rule." The Corps found that approximately 121 bird species had been observed at the site, including several known to depend upon aquatic environments for a significant portion of their life requirements. Thus, on November 16, 1987, the Corps formally "determined that the seasonally ponded, abandoned gravel mining depressions located on the project site, while not wetlands, did qualify as 'waters of the United States' . . . based upon the following criteria: (1) the proposed site had been abandoned as a gravel mining operation; (2) the water areas and spoil piles had developed a natural character; and (3) the water areas

---

[1] The Corps issued the "Migratory Bird Rule" without following the notice and comment procedures outlined in the Administrative Procedure Act, 5 U. S. C. §553.

are used as habitat by migratory bird [sic] which cross state lines." U. S. Army Corps of Engineers, Chicago District, Dept. of Army Permit Evaluation and Decision Document, Lodging of Petitioner, Tab No. 1, p. 6.

During the application process, SWANCC made several proposals to mitigate the likely displacement of the migratory birds and to preserve a great blue heron rookery located on the site. Its balefill project ultimately received the necessary local and state approval. By 1993, SWANCC had received a special use planned development permit from the Cook County Board of Appeals, a landfill development permit from the Illinois Environmental Protection Agency, and approval from the Illinois Department of Conservation.

Despite SWANCC's securing the required water quality certification from the Illinois Environmental Protection Agency, the Corps refused to issue a § 404(a) permit. The Corps found that SWANCC had not established that its proposal was the "least environmentally damaging, most practicable alternative" for disposal of nonhazardous solid waste; that SWANCC's failure to set aside sufficient funds to remediate leaks posed an "unacceptable risk to the public's drinking water supply"; and that the impact of the project upon area-sensitive species was "unmitigatable since a landfill surface cannot be redeveloped into a forested habitat." Id., at 87.

Petitioner filed suit under the Administrative Procedure Act, 5 U. S. C. § 701 et seq., in the Northern District of Illinois challenging both the Corps' jurisdiction over the site and the merits of its denial of the § 404(a) permit. The District Court granted summary judgment to respondents on the jurisdictional issue, and petitioner abandoned its challenge to the Corps' permit decision. On appeal to the Court of Appeals for the Seventh Circuit, petitioner renewed its attack on respondents' use of the "Migratory Bird Rule" to assert jurisdiction over the site. Petitioner argued that respondents had exceeded their statutory authority in interpreting

the CWA to cover nonnavigable, isolated, intrastate waters based upon the presence of migratory birds and, in the alternative, that Congress lacked the power under the Commerce Clause to grant such regulatory jurisdiction.

The Court of Appeals began its analysis with the constitutional question, holding that Congress has the authority to regulate such waters based upon "the cumulative impact doctrine, under which a single activity that itself has no discernible effect on interstate commerce may still be regulated if the aggregate effect of that class of activity has a substantial impact on interstate commerce." 191 F. 3d 845, 850 (CA7 1999). The aggregate effect of the "destruction of the natural habitat of migratory birds" on interstate commerce, the court held, was substantial because each year millions of Americans cross state lines and spend over a billion dollars to hunt and observe migratory birds.[2] *Ibid.* The Court of Appeals then turned to the regulatory question. The court held that the CWA reaches as many waters as the Commerce Clause allows and, given its earlier Commerce Clause ruling, it therefore followed that respondents' "Migratory Bird Rule" was a reasonable interpretation of the Act. See *id.*, at 851–852.

We granted certiorari, 529 U. S. 1129 (2000), and now reverse.

Congress passed the CWA for the stated purpose of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U. S. C. § 1251(a). In so doing, Congress chose to "recognize, preserve, and protect the primary responsibilities and rights of

---

[2] Relying upon its earlier decision in *Hoffman Homes, Inc.* v. *EPA*, 999 F. 2d 256 (CA7 1993), and a report from the United States Census Bureau, the Court of Appeals found that in 1996 approximately 3.1 million Americans spent $1.3 billion to hunt migratory birds (with 11 percent crossing state lines to do so) as another 17.7 million Americans observed migratory birds (with 9.5 million traveling for the purpose of observing shorebirds). See 191 F. 3d, at 850.

States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter." § 1251(b). Relevant here, § 404(a) authorizes respondents to regulate the discharge of fill material into "navigable waters," 33 U. S. C. § 1344(a), which the statute defines as "the waters of the United States, including the territorial seas," § 1362(7). Respondents have interpreted these words to cover the abandoned gravel pit at issue here because it is used as habitat for migratory birds. We conclude that the "Migratory Bird Rule" is not fairly supported by the CWA.

This is not the first time we have been called upon to evaluate the meaning of § 404(a). In *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985), we held that the Corps had § 404(a) jurisdiction over wetlands that actually abutted on a navigable waterway. In so doing, we noted that the term "navigable" is of "limited import" and that Congress evidenced its intent to "regulate at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Id.*, at 133. But our holding was based in large measure upon Congress' unequivocal acquiescence to, and approval of, the Corps' regulations interpreting the CWA to cover wetlands adjacent to navigable waters. See *id.*, at 135–139. We found that Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands "inseparably bound up with the 'waters' of the United States." *Id.*, at 134.

It was the significant nexus between the wetlands and "navigable waters" that informed our reading of the CWA in *Riverside Bayview Homes.* Indeed, we did not "express any opinion" on the "question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to bodies of open water . . . ." *Id.*, at 131–132,

n. 8. In order to rule for respondents here, we would have to hold that the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water. But we conclude that the text of the statute will not allow this.

Indeed, the Corps' *original* interpretation of the CWA, promulgated two years after its enactment, is inconsistent with that which it espouses here. Its 1974 regulations defined § 404(a)'s "navigable waters" to mean "those waters of the United States which are subject to the ebb and flow of the tide, and/or are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce." 33 CFR § 209.120(d)(1). The Corps emphasized that "[i]t is the water body's capability of use by the public for purposes of transportation or commerce which is the determinative factor." § 209.260(e)(1). Respondents put forward no persuasive evidence that the Corps mistook Congress' intent in 1974.[3]

Respondents next contend that whatever its original aim in 1972, Congress charted a new course five years later when it approved the more expansive definition of "navigable waters" found in the Corps' 1977 regulations. In July 1977, the Corps formally adopted 33 CFR § 323.2(a)(5) (1978), which defined "waters of the United States" to include "isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect

---

[3] Respondents refer us to portions of the legislative history that they believe indicate Congress' intent to expand the definition of "navigable waters." Although the Conference Report includes the statement that the conferees "intend that the term 'navigable waters' be given the broadest possible constitutional interpretation," S. Conf. Rep. No. 92–1236, p. 144 (1972), neither this, nor anything else in the legislative history to which respondents point, signifies that Congress intended to exert anything more than its commerce power over navigation. Indeed, respondents admit that the legislative history is somewhat ambiguous. See Brief for Federal Respondents 24.

interstate commerce." Respondents argue that Congress was aware of this more expansive interpretation during its 1977 amendments to the CWA. Specifically, respondents point to a failed House bill, H. R. 3199, that would have defined "navigable waters" as "all waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce." 123 Cong. Rec. 10420, 10434 (1977).[4] They also point to the passage in §404(g)(1) that authorizes a State to apply to the Environmental Protection Agency for permission "to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce . . . , including wetlands adjacent thereto) within its jurisdiction . . . ." 33 U. S. C. §1344(g)(1). The failure to pass legislation that would have overturned the Corps' 1977 regulations and the extension of jurisdiction in §404(g) to waters "other than" traditional "navigable waters," respondents submit, indicate that Congress recognized and accepted a broad definition of "navigable waters" that includes nonnavigable, isolated, intrastate waters.

Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care.[5] "[F]ailed legis-

---

[4] While this bill passed in the House, a similarly worded amendment to a bill originating in the Senate, S. 1952, failed. See 123 Cong. Rec. 26710, 26728 (1977).

[5] In *Bob Jones Univ.* v. *United States*, 461 U. S. 574, 595, 600–601 (1983), for example, we upheld an Internal Revenue Service (IRS) Revenue Ruling that revoked the tax-exempt status of private schools practicing racial discrimination because the IRS' interpretation of the relevant statutes was "correct"; because Congress had held "hearings on this precise issue," making it "hardly conceivable that Congress—and in this setting, any Member of Congress—was not abundantly aware of what was going on";

lative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'" *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 187 (1994) (quoting *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 650 (1990)). A bill can be proposed for any number of reasons, and it can be rejected for just as many others. The relationship between the actions and inactions of the 95th Congress and the intent of the 92d Congress in passing § 404(a) is also considerably attenuated. Because "subsequent history is less illuminating than the contemporaneous evidence," *Hagen* v. *Utah*, 510 U. S. 399, 420 (1994), respondents face a difficult task in overcoming the plain text and import of § 404(a).

We conclude that respondents have failed to make the necessary showing that the failure of the 1977 House bill demonstrates Congress' acquiescence to the Corps' regulations or the "Migratory Bird Rule," which, of course, did not first appear until 1986. Although respondents cite some legislative history showing Congress' recognition of the Corps' assertion of jurisdiction over "isolated waters,"[6] as we explained in *Riverside Bayview Homes*, "[i]n both Chambers, debate on the proposals to narrow the definition of navigable waters centered largely on the issue of wetlands preservation." 474 U. S., at 136. Beyond Congress' desire to regu-

---

and because "no fewer than 13 bills introduced to overturn the IRS interpretation" had failed. Absent such overwhelming evidence of acquiescence, we are loath to replace the plain text and original understanding of a statute with an amended agency interpretation. See *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 118, n. 13 (1980) ("[E]ven when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment").

[6] Respondents cite, for example, the Senate Report on S. 1952, which referred to the Corps' "isolated waters" regulation. See S. Rep. No. 95–370, p. 75 (1977). However, the same report reiterated that "[t]he committee amendment does not redefine navigable waters." *Ibid.*

late wetlands adjacent to "navigable waters," respondents point us to no persuasive evidence that the House bill was proposed in response to the Corps' claim of jurisdiction over nonnavigable, isolated, intrastate waters or that its failure indicated congressional acquiescence to such jurisdiction.

Section 404(g) is equally unenlightening. In *Riverside Bayview Homes* we recognized that Congress intended the phrase "navigable waters" to include "at least some waters that would not be deemed 'navigable' under the classical understanding of that term." *Id.*, at 133. But § 404(g) gives no intimation of what those waters might be; it simply refers to them as "other . . . waters." Respondents conjecture that "other . . . waters" must incorporate the Corps' 1977 regulations, but it is also plausible, as petitioner contends, that Congress simply wanted to include all waters adjacent to "navigable waters," such as nonnavigable tributaries and streams. The exact meaning of § 404(g) is not before us and we express no opinion on it, but for present purposes it is sufficient to say, as we did in *Riverside Bayview Homes*, that "§ 404(g)(1) does not conclusively determine the construction to be placed on the use of the term 'waters' elsewhere in the Act (particularly in § 502(7), which contains the relevant definition of 'navigable waters') . . . ." *Id.*, at 138, n. 11.[7]

We thus decline respondents' invitation to take what they see as the next ineluctable step after *Riverside Bayview Homes:* holding that isolated ponds, some only seasonal, wholly located within two Illinois counties, fall under § 404(a)'s definition of "navigable waters" because they serve

---

[7] Respondents also make a passing reference to Congress' decision in 1977 to exempt certain types of discharges from § 404(a), including, for example, "discharge of dredged or fill material . . . for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches." § 67, 91 Stat. 1600, 33 U. S. C. § 1344(f)(C). As § 404(a) only regulates dredged or fill material that is discharged "into navigable waters," Congress' decision to exempt certain types of these discharges does not affect, much less address, the definition of "navigable waters."

as habitat for migratory birds. As counsel for respondents conceded at oral argument, such a ruling would assume that "the use of the word navigable in the statute . . . does not have any independent significance." Tr. of Oral Arg. 28. We cannot agree that Congress' separate definitional use of the phrase "waters of the United States" constitutes a basis for reading the term "navigable waters" out of the statute. We said in *Riverside Bayview Homes* that the word "navigable" in the statute was of "limited import," 474 U. S., at 133, and went on to hold that § 404(a) extended to nonnavigable wetlands adjacent to open waters. But it is one thing to give a word limited effect and quite another to give it no effect whatever. The term "navigable" has at least the import of showing us what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made. See, *e. g., United States* v. *Appalachian Elec. Power Co.,* 311 U. S. 377, 407–408 (1940).

Respondents—relying upon all of the arguments addressed above—contend that, at the very least, it must be said that Congress did not address the precise question of § 404(a)'s scope with regard to nonnavigable, isolated, intrastate waters, and that, therefore, we should give deference to the "Migratory Bird Rule." See, *e. g., Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). We find § 404(a) to be clear, but even were we to agree with respondents, we would not extend *Chevron* deference here.

Where an administrative interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988). This requirement stems from our prudential desire not to needlessly reach constitutional issues and our assumption that Congress does not casually authorize administrative agencies to interpret a

statute to push the limit of congressional authority. See *ibid.* This concern is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power. See *United States* v. *Bass,* 404 U. S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance"). Thus, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *DeBartolo, supra,* at 575.

Twice in the past six years we have reaffirmed the proposition that the grant of authority to Congress under the Commerce Clause, though broad, is not unlimited. See *United States* v. *Morrison,* 529 U. S. 598 (2000); *United States* v. *Lopez,* 514 U. S. 549 (1995). Respondents argue that the "Migratory Bird Rule" falls within Congress' power to regulate intrastate activities that "substantially affect" interstate commerce. They note that the protection of migratory birds is a "national interest of very nearly the first magnitude," *Missouri* v. *Holland,* 252 U. S. 416, 435 (1920), and that, as the Court of Appeals found, millions of people spend over a billion dollars annually on recreational pursuits relating to migratory birds. These arguments raise significant constitutional questions. For example, we would have to evaluate the precise object or activity that, in the aggregate, substantially affects interstate commerce. This is not clear, for although the Corps has claimed jurisdiction over petitioner's land because it contains water areas used as habitat by migratory birds, respondents now, *post litem motam,* focus upon the fact that the regulated activity is petitioner's municipal landfill, which is "plainly of a commercial nature." Brief for Federal Respondents 43. But this is a far cry, indeed, from the "navigable waters" and "waters of the United States" to which the statute by its terms extends.

These are significant constitutional questions raised by respondents' application of their regulations, and yet we find nothing approaching a clear statement from Congress that it intended § 404(a) to reach an abandoned sand and gravel pit such as we have here. Permitting respondents to claim federal jurisdiction over ponds and mudflats falling within the "Migratory Bird Rule" would result in a significant impingement of the States' traditional and primary power over land and water use. See, *e. g., Hess* v. *Port Authority Trans-Hudson Corporation,* 513 U. S. 30, 44 (1994) ("[R]egulation of land use [is] a function traditionally performed by local governments"). Rather than expressing a desire to readjust the federal-state balance in this manner, Congress chose to "recognize, preserve, and protect the primary responsibilities and rights of States . . . to plan the development and use . . . of land and water resources . . . ." 33 U. S. C. § 1251(b). We thus read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject the request for administrative deference.[8]

We hold that 33 CFR § 328.3(a)(3) (1999), as clarified and applied to petitioner's balefill site pursuant to the "Migratory Bird Rule," 51 Fed. Reg. 41217 (1986), exceeds the authority granted to respondents under § 404(a) of the CWA. The judgment of the Court of Appeals for the Seventh Circuit is therefore

*Reversed.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

In 1969, the Cuyahoga River in Cleveland, Ohio, coated with a slick of industrial waste, caught fire. Congress re-

---

[8] Because violations of the CWA carry criminal penalties, see 33 U. S. C. § 1319(c)(2), petitioner invokes the rule of lenity as another basis for rejecting the Corps' interpretation of the CWA. Brief for Petitioner 31–32. We need not address this alternative argument. See *United States* v. *Shabani,* 513 U. S. 10, 17 (1994).

sponded to that dramatic event, and to others like it, by enacting the Federal Water Pollution Control Act (FWPCA) Amendments of 1972, 86 Stat. 817, as amended, 33 U. S. C. § 1251 *et seq.*, commonly known as the Clean Water Act (Clean Water Act, CWA, or Act).[1]  The Act proclaimed the ambitious goal of ending water pollution by 1985.  § 1251(a). The Court's past interpretations of the CWA have been fully consistent with that goal.  Although Congress' vision of zero pollution remains unfulfilled, its pursuit has unquestionably retarded the destruction of the aquatic environment.  Our Nation's waters no longer burn.  Today, however, the Court takes an unfortunate step that needlessly weakens our principal safeguard against toxic water.

It is fair to characterize the Clean Water Act as "watershed" legislation.  The statute endorsed fundamental changes in both the purpose and the scope of federal regulation of the Nation's waters.  In § 13 of the Rivers and Harbors Appropriation Act of 1899 (RHA), 30 Stat. 1152, as amended, 33 U. S. C. § 407, Congress had assigned to the Army Corps of Engineers (Corps) the mission of regulating discharges into certain waters in order to protect their use as highways for the transportation of interstate and foreign commerce; the scope of the Corps' jurisdiction under the RHA accordingly extended only to waters that were "navigable."  In the CWA, however, Congress broadened the Corps' mission to include the purpose of protecting the quality of our Nation's waters for esthetic, health, recreational, and environmental uses.  The scope of its jurisdiction was therefore redefined to encompass all of "the waters of the United States, including the territorial seas." § 1362(7).  That definition requires neither actual nor potential navigability.

The Court has previously held that the Corps' broadened jurisdiction under the CWA properly included an 80-acre

---

[1] See R. Adler, J. Landman, & D. Cameron, The Clean Water Act: 20 Years Later 5–10 (1993).

parcel of low-lying marshy land that was not itself navigable, directly adjacent to navigable water, or even hydrologically connected to navigable water, but which was part of a larger area, characterized by poor drainage, that ultimately abutted a navigable creek. *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985).[2] Our broad finding in *Riverside Bayview* that the 1977 Congress had acquiesced in the Corps' understanding of its jurisdiction applies equally to the 410-acre parcel at issue here. Moreover, once Congress crossed the legal watershed that separates navigable streams of commerce from marshes and inland lakes, there is no principled reason for limiting the statute's protection to those waters or wetlands that happen to lie near a navigable stream.

In its decision today, the Court draws a new jurisdictional line, one that invalidates the 1986 migratory bird regulation as well as the Corps' assertion of jurisdiction over all waters

---

[2] See also App. to Pet. for Cert. 25a, and Brief for United States 8, n. 7, in *Riverside Bayview*, O. T. 1984, No. 84–701. The District Court in *Riverside Bayview* found that there was no direct "hydrological" connection between the parcel at issue and any nearby navigable waters. App. to Pet. for Cert. in *Riverside Bayview* 25a. The wetlands characteristics of the parcel were due, not to a surface or groundwater connection to any actually navigable water, but to "poor drainage" resulting from "the Lamson soil that underlay the property." Brief for Respondent in *Riverside Bayview* 7. Nevertheless, this Court found occasional surface runoff from the property into nearby waters to constitute a meaningful connection. *Riverside Bayview*, 474 U. S., at 134; Brief for United States in *Riverside Bayview* 8, n. 7. Of course, the *ecological* connection between the wetlands and the nearby waters also played a central role in this Court's decision. *Riverside Bayview*, 474 U. S., at 134–135. Both types of connection are also present in many, and possibly most, "isolated" waters. Brief for Dr. Gene Likens et al. as *Amici Curiae* 6–22. Indeed, although the majority and petitioner both refer to the waters on petitioner's site as "isolated," *ante*, at 172; Brief for Petitioner 11, their role as habitat for migratory birds, birds that serve important functions in the ecosystems of other waters throughout North America, suggests that—ecologically speaking—the waters at issue in this case are anything but isolated.

except for actually navigable waters, their tributaries, and wetlands adjacent to each. Its holding rests on two equally untenable premises: (1) that when Congress passed the 1972 CWA, it did not intend "to exert anything more than its commerce power over navigation," *ante*, at 168, n. 3; and (2) that in 1972 Congress drew the boundary defining the Corps' jurisdiction at the odd line on which the Court today settles.

As I shall explain, the text of the 1972 amendments affords no support for the Court's holding, and amendments Congress adopted in 1977 do support the Corps' present interpretation of its mission as extending to so-called "isolated" waters. Indeed, simple common sense cuts against the particular definition of the Corps' jurisdiction favored by the majority.

I

The significance of the FWPCA Amendments of 1972 is illuminated by a reference to the history of federal water regulation, a history that the majority largely ignores. Federal regulation of the Nation's waters began in the 19th century with efforts targeted exclusively at "promot[ing] water transportation and commerce." Kalen, Commerce to Conservation: The Call for a National Water Policy and the Evolution of Federal Jurisdiction Over Wetlands, 69 N. D. L. Rev. 873, 877 (1993). This goal was pursued through the various Rivers and Harbors Acts, the most comprehensive of which was the RHA of 1899.[3] Section 13 of the 1899 RHA, commonly known as the Refuse Act, prohibited the discharge of "refuse" into any "navigable water" or its tributaries, as well as the deposit of "refuse" on the bank of a navigable water "whereby navigation shall or may be impeded or obstructed" without first obtaining a permit from the Secretary of the Army. 30 Stat. 1152.

---

[3] See also Rivers and Harbors Appropriations Act of 1896, 29 Stat. 234; River and Harbor Act of 1894, 28 Stat. 363; River and Harbor Appropriations Act of 1890, 26 Stat. 426; The River and Harbor Appropriations Act of 1886, 24 Stat. 329.

During the middle of the 20th century, the goals of federal water regulation began to shift away from an exclusive focus on protecting navigability and toward a concern for preventing environmental degradation. Kalen, 69 N. D. L. Rev., at 877–879, and n. 30. This awakening of interest in the use of federal power to protect the aquatic environment was helped along by efforts to reinterpret § 13 of the RHA in order to apply its permit requirement to industrial discharges into navigable waters, even when such discharges did nothing to impede navigability. See, *e. g., United States* v. *Republic Steel Corp.*, 362 U. S. 482, 490–491 (1960) (noting that the term "refuse" in § 13 was broad enough to include industrial waste).[4]   Seeds of this nascent concern with pollution control can also be found in the FWPCA, which was first enacted in 1948 and then incrementally expanded in the following years.[5]

---

[4] In 1970, the House Committee on Government Operations followed the Court's lead and advocated the use of § 13 as a pollution control provision. H. R. Rep. No. 91–917, pp. 14–18 (1970).   President Nixon responded by issuing Executive Order No. 11574, 35 Fed. Reg. 19627 (1970) (revoked by Exec. Order No. 12553, 51 Fed. Reg. 7237 (1986)), which created the Refuse Act Permit Program.   Power, The Fox in the Chicken Coop: The Regulatory Program of the U. S. Army Corps of Engineers, 63 Va. L. Rev. 503, 512 (1977) (hereinafter Power).   The program ended soon after it started, however, when a District Court, reading the language of § 13 literally, held the permit program invalid.   *Ibid.;* see *Kalur* v. *Resor*, 335 F. Supp. 1, 9 (DC 1971).

[5] The FWPCA of 1948 applied only to "interstate waters."   § 10(e), 62 Stat. 1161.   Subsequently, it was harmonized with the Rivers and Harbors Act such that—like the earlier statute—the FWPCA defined its jurisdiction with reference to "navigable waters."   Pub. L. 89–753, § 211, 80 Stat. 1252.   None of these early versions of the FWPCA could fairly be described as establishing a comprehensive approach to the problem, but they did contain within themselves several of the elements that would later be employed in the CWA.   *Milwaukee* v. *Illinois*, 451 U. S. 304, 318, n. 10 (1981) (REHNQUIST, J.) (Congress intended to do something "quite different" in the 1972 Act); 2 W. Rodgers, Environmental Law: Air and Water § 4.1, pp. 10–11 (1986) (describing the early versions of the FWPCA).

The shift in the focus of federal water regulation from protecting navigability toward environmental protection reached a dramatic climax in 1972, with the passage of the CWA. The Act, which was passed as an amendment to the existing FWPCA, was universally described by its supporters as the first truly comprehensive federal water pollution legislation. The "major purpose" of the CWA was "to establish a *comprehensive* long-range policy for the elimination of water pollution." S. Rep. No. 92–414, p. 95 (1971), 2 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–1, p. 1511 (1971) (hereinafter Leg. Hist.) (emphasis added). And "[n]o Congressman's remarks on the legislation were complete without reference to [its] 'comprehensive' nature . . . ." *Milwaukee* v. *Illinois*, 451 U. S. 304, 318 (1981) (REHNQUIST, J.). A House sponsor described the bill as "the most comprehensive and far-reaching water pollution bill we have ever drafted," 1 Leg. Hist. 369 (Rep. Mizell), and Senator Randolph, Chairman of the Committee on Public Works, stated: "It is perhaps the most comprehensive legislation that the Congress of the United States has ever developed in this particular field of the environment." 2 *id.*, at 1269. This Court was therefore undoubtedly correct when it described the 1972 amendments as establishing "a comprehensive program for controlling and abating water pollution." *Train* v. *City of New York*, 420 U. S. 35, 37 (1975).

Section 404 of the CWA resembles § 13 of the RHA, but, unlike the earlier statute, the primary purpose of which is the maintenance of navigability, § 404 was principally intended as a pollution control measure. A comparison of the contents of the RHA and the 1972 Act vividly illustrates the fundamental difference between the purposes of the two provisions. The earlier statute contains pages of detailed appropriations for improvements in specific navigation facilities, 30 Stat. 1121–1149, for studies concerning the feasibility

of a canal across the Isthmus of Panama, *id.*, at 1150, and for surveys of the advisability of harbor improvements at numerous other locations, *id.*, at 1155–1161. Tellingly, § 13, which broadly prohibits the discharge of refuse into navigable waters, contains an exception for refuse "flowing from streets and sewers . . . in a liquid state." *Id.*, at 1152.

The 1972 Act, in contrast, appropriated large sums of money for research and related programs for water pollution control, 86 Stat. 816–833, and for the construction of water treatment works, *id.*, at 833–844. Strikingly absent from its declaration of "goals and policy" is *any* reference to avoiding or removing obstructions to navigation. Instead, the principal objective of the Act, as stated by Congress in § 101, was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U. S. C. § 1251. Congress therefore directed federal agencies in § 102 to "develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters." 33 U. S. C. § 1252. The CWA commands federal agencies to give "due regard," not to the interest of unobstructed navigation, but rather to "improvements which are necessary to conserve such waters for the protection and propagation of fish and aquatic life and wildlife [and] recreational purposes." *Ibid.*

Because of the statute's ambitious and comprehensive goals, it was, of course, necessary to expand its jurisdictional scope. Thus, although Congress opted to carry over the traditional jurisdictional term "navigable waters" from the RHA and prior versions of the FWPCA, it broadened the *definition* of that term to encompass all "waters of the United States." § 1362(7).[6] Indeed, the 1972 conferees arrived at the final formulation by specifically deleting the

---

[6] The definition of "navigable water" in earlier versions of the FWPCA had made express reference to navigability. § 211, 80 Stat. 1253.

word "navigable" from the definition that had originally appeared in the House version of the Act.[7] The majority today undoes that deletion.

The Conference Report explained that the definition in § 502(7) was intended to "be given the broadest possible constitutional interpretation." S. Conf. Rep. No. 92–1236, p. 144 (1972), reprinted in 1 Leg. Hist. 327. The Court dismisses this clear assertion of legislative intent with the back of its hand. *Ante*, at 168, n. 3. The statement, it claims, "signifies that Congress intended to exert [nothing] more than its commerce power over navigation." *Ibid.*

The majority's reading drains all meaning from the conference amendment. By 1972, Congress' Commerce Clause power over "navigation" had long since been established. *The Daniel Ball*, 10 Wall. 557 (1871); *Gilman* v. *Philadelphia*, 3 Wall. 713 (1866); *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824). Why should Congress intend that its assertion of federal jurisdiction be given the "broadest possible constitutional interpretation" if it did not intend to reach beyond the very heartland of its commerce power? The activities regulated by the CWA have nothing to do with Congress' "commerce power over navigation." Indeed, the goals of the 1972 statute have nothing to do with *navigation* at all.

As we recognized in *Riverside Bayview*, the interests served by the statute embrace the protection of " 'significant natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites' " for various species of aquatic wildlife. 474 U. S., at 134–135. For wetlands and "isolated" inland lakes, that in-

---

[7] The version adopted by the House of Representatives defined "navigable waters" as "the navigable waters of the United States, including the territorial seas." H. R. 11896, 92d Cong., 2d Sess., § 502(8) (1971), reprinted in 1 Leg. Hist. 1069. The CWA ultimately defined "navigable waters" simply as "the waters of the United States, including the territorial seas." 33 U. S. C. § 1362(7).

terest is equally powerful, regardless of the proximity of the swamp or the water to a navigable stream. Nothing in the text, the stated purposes, or the legislative history of the CWA supports the conclusion that in 1972 Congress contemplated—much less commanded—the odd jurisdictional line that the Court has drawn today.

The majority accuses respondents of reading the term "navigable" out of the statute. *Ante,* at 172. But that was accomplished by Congress when it deleted the word from the § 502(7) definition. After all, it is the *definition* that is the appropriate focus of our attention. *Babbitt* v. *Sweet Home Chapter, Communities for Great Ore.,* 515 U. S. 687, 697–698, n. 10 (1995) (refusing to be guided by the common-law definition of the term "take" when construing that term within the Endangered Species Act of 1973 and looking instead to the meaning of the terms contained in the definition of "take" supplied by the statute). Moreover, a proper understanding of the history of federal water pollution regulation makes clear that—even on respondents' broad reading—the presence of the word "navigable" in the statute is not inexplicable. The term was initially used in the various Rivers and Harbors Acts because (1) at the time those statutes were first enacted, Congress' power over the Nation's waters was viewed as extending only to "water bodies that were deemed 'navigable' and therefore suitable for moving goods to or from markets," Power 513; and (2) those statutes had the primary purpose of protecting navigation. Congress' choice to employ the term "navigable waters" in the 1972 Clean Water Act simply continued nearly a century of usage. Viewed in light of the history of federal water regulation, the broad § 502(7) definition, and Congress' unambiguous instructions in the Conference Report, it is clear that the term "navigable waters" operates in the statute as a shorthand for "waters over which federal authority may properly be asserted."

## II

As the majority correctly notes, *ante*, at 168, when the Corps first promulgated regulations pursuant to § 404 of the 1972 Act, it construed its authority as being essentially the same as it had been under the 1899 RHA.[8]   The reaction to those regulations in the federal courts,[9] in the Environmental Protection Agency (EPA),[10] and in Congress[11] convinced

---

[8] The Corps later acknowledged that the 1974 regulations "limited the Section 404 permit program to the same waters that were being regulated under the River and Harbor Act of 1899." 42 Fed. Reg. 37123 (1977). Although refusing to defer to the Corps' *present* interpretation of the statute, *ante*, at 172, the majority strangely attributes some significance to the Corps' *initial* reluctance to read the 1972 Act as expanding its jurisdiction, *ante*, at 168 ("Respondents put forward no persuasive evidence that the Corps mistook Congress' intent in 1974").   But, stranger still, by construing the statute as extending to nonnavigable tributaries and adjacent wetlands, the majority reads the statute more broadly than the 1974 regulations that it seems willing to accept as a correct construction of the Corps' jurisdiction.   As I make clear in the text, there is abundant evidence that the Corps was wrong in 1974 and that the Court is wrong today.

[9] See, *e. g.*, *Natural Resources Defense Council* v. *Callaway*, 392 F. Supp. 685, 686 (DC 1975); *United States* v. *Holland*, 373 F. Supp. 665 (MD Fla. 1974).

[10] In a 1974 letter to the head of the Corps, the EPA Administrator expressed his disagreement with the Corps' parsimonious view of its own jurisdiction under the CWA.   Section 404 of the Federal Water Pollution Control Act Amendments of 1972: Hearings before the Senate Committee on Public Works, 94th Cong., 2d Sess., 349 (1976) (letter dated June 19, 1974, from Russell E. Train, Administrator of EPA, to Lt. Gen. W. C. Gribble, Jr., Chief of Corps of Engineers).   The EPA is the agency that generally administers the CWA, except as otherwise provided.   33 U. S. C. § 1251(d); see also 43 Op. Atty. Gen. 197 (1979) ("Congress intended to confer upon the administrator of the [EPA] the final administrative authority" to determine the reach of the term "navigable waters").

[11] The House Committee on Government Operations noted the disagreement between the EPA and the Corps over the meaning of "navigable waters" and ultimately expressed its agreement with the EPA's broader reading of the statute.   H. R. Rep. No. 93–1396, pp. 23–27 (1974).

the Corps that the statute required it "to protect water quality to the full extent of the [C]ommerce [C]lause" and to extend federal regulation over discharges "to many areas that have never before been subject to Federal permits or to this form of water quality protection." 40 Fed. Reg. 31320 (1975).

In 1975, the Corps therefore adopted the interim regulations that we upheld in *Riverside Bayview*. As we noted in that case, the new regulations understood "the waters of the United States" to include, not only navigable waters and their tributaries, but also "nonnavigable intrastate waters whose use or misuse could affect interstate commerce." 474 U. S., at 123. The 1975 regulations provided that the new program would become effective in three phases: phase 1, which became effective immediately, encompassed the navigable waters covered by the 1974 regulation and the RHA; phase 2, effective after July 1, 1976, extended Corps jurisdiction to nonnavigable tributaries, freshwater wetlands adjacent to primary navigable waters, and lakes; and phase 3, effective after July 1, 1977, extended Corps jurisdiction to all other waters covered under the statute, including any waters not covered by phases 1 and 2 (such as "intermittent rivers, streams, tributaries, and perched wetlands that are not contiguous or adjacent to navigable waters") that "the District Engineer determines necessitate regulation for the protection of water quality." 40 Fed. Reg. 31325–31326 (1975). The final version of these regulations, adopted in 1977, made clear that the covered waters included "isolated lakes and wetlands, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce." [12]

---

[12] 42 Fed. Reg. 37127 (1977), as amended, 33 CFR § 328.3(a)(3) (1977). The so-called "migratory bird" rule, upon which the Corps based its assertion of jurisdiction in this case, is merely a specific application of the more general jurisdictional definition first adopted in the 1975 and 1977

The Corps' broadened reading of its jurisdiction provoked opposition among some Members of Congress. As a result, in 1977, Congress considered a proposal that would have limited the Corps' jurisdiction under § 404 to waters that are used, or by reasonable improvement could be used, as a means to transport interstate or foreign commerce and their adjacent wetlands. H. R. 3199, 95th Cong., 1st Sess., § 16(f) (1977). A bill embodying that proposal passed the House but was defeated in the Senate. The debates demonstrate that Congress was fully aware of the Corps' understanding of the scope of its jurisdiction under the 1972 Act. We summarized these debates in our opinion in *Riverside Bayview:*

"In both Chambers, debate on the proposals to narrow the definition of navigable waters centered largely on the issue of wetlands preservation. See [123 Cong. Rec.], at 10426–10432 (House debate); *id.*, at 26710–26729 (Senate debate). Proponents of a more limited § 404 jurisdiction contended that the Corps' assertion of jurisdiction over wetlands and other nonnavigable 'waters' had far exceeded what Congress had intended in enacting § 404. Opponents of the proposed changes argued that a narrower definition of 'navigable waters' for purposes of § 404 would exclude vast stretches of crucial wetlands from the Corps' jurisdiction, with detrimental effects on wetlands ecosystems, water quality, and the aquatic environment generally. The debate, particularly in the Senate, was lengthy. In the House, the debate ended with the adoption of a narrowed definition of

rules. The "rule," which operates as a rule of thumb for identifying the waters that fall within the Corps' jurisdiction over phase 3 waters, first appeared in the preamble to a 1986 repromulgation of the Corps' definition of "navigable waters." 51 Fed. Reg. 41217 (1986). As the Corps stated in the preamble, this repromulgation was not intended to alter its jurisdiction in any way. *Ibid.* Instead, the Corps indicated, the migratory bird rule was enacted simply to "clarif[y]" the scope of existing jurisdictional regulations. *Ibid.*

'waters'; but in the Senate the limiting amendment was defeated and the old definition retained. The Conference Committee adopted the Senate's approach: efforts to narrow the definition of 'waters' were abandoned; the legislation as ultimately passed, in the words of Senator Baker, 'retain[ed] the comprehensive jurisdiction over the Nation's waters exercised in the 1972 Federal Water Pollution Control Act.'" 474 U. S., at 136–137.

The net result of that extensive debate was a congressional endorsement of the position that the Corps maintains today. We explained in *Riverside Bayview:*

> "[T]he scope of the Corps' asserted jurisdiction over wetlands was specifically brought to Congress' attention, and Congress rejected measures designed to curb the Corps' jurisdiction in large part because of its concern that protection of wetlands would be unduly hampered by a narrowed definition of 'navigable waters.' Although we are chary of attributing significance to Congress' failure to act, a refusal by Congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction, particularly where the administrative construction has been brought to Congress' attention through legislation specifically designed to supplant it." *Id.,* at 137.

Even if the majority were correct that Congress did not extend the Corps' jurisdiction in the 1972 CWA to reach beyond navigable waters and their nonnavigable tributaries, Congress' rejection of the House's efforts in 1977 to cut back on the Corps' 1975 assertion of jurisdiction clearly indicates congressional acquiescence in that assertion. Indeed, our broad determination in *Riverside Bayview* that the 1977 Congress acquiesced in the very regulations at issue in this case should foreclose petitioner's present urgings to the contrary. The majority's refusal in today's decision to acknowledge the scope of our prior decision is troubling. Compare

*id.,* at 136 ("Congress acquiesced in the [1975] administrative construction [of the Corps' jurisdiction]"), with *ante,* at 170 ("We conclude that respondents have failed to make the necessary showing that the failure of the 1977 House bill demonstrates Congress' acquiescence to the Corps' regulations . . .").[13]   Having already concluded that Congress acquiesced in the Corps' regulatory definition of its jurisdiction, the Court is wrong to reverse course today.   See *Dickerson* v. *United States,* 530 U. S. 428, 443 (2000) (REHNQUIST, C. J.) (" '[T]he doctrine [of *stare decisis*] carries such persuasive force that we have always required a departure from precedent to be supported by some "special justification" ' ").

More important than the 1977 bill that did not become law are the provisions that actually were included in the 1977 revisions.   Instead of agreeing with those who sought to withdraw the Corps' jurisdiction over "isolated" waters,

---

[13] The majority appears to believe that its position is consistent with *Riverside Bayview* because of that case's reservation of the question whether the Corps' jurisdiction extends to "certain wetlands not necessarily adjacent to other waters," 474 U. S., at 124, n. 2.   But it is clear from the context that the question reserved by *Riverside Bayview* did not concern "isolated" *waters,* such as those at issue in this case, but rather "isolated" *wetlands.*   See *id.,* at 131–132, n. 8 ("We are not called upon to address the question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to bodies of open water . . .").   Unlike the open waters present on petitioner's site, wetlands are *lands* "that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.   Wetlands generally include swamps, marshes, bogs, and similar areas." 33 CFR § 328.3(b) (2000).   If, as I believe, actually navigable waters lie at the very heart of Congress' commerce power and "isolated," nonnavigable waters lie closer to (but well within) the margin, "isolated wetlands," which are themselves only marginally "waters," are the most marginal category of "waters of the United States" potentially covered by the statute.   It was the question of the extension of federal jurisdiction to *that* category of "waters" that the *Riverside Bayview* Court reserved.   That question is not presented in this case.

Congress opted to exempt several classes of such waters from federal control.    § 67, 91 Stat. 1601, 33 U. S. C. § 1344(f). For example, the 1977 amendments expressly exclude from the Corps' regulatory power the discharge of fill material "for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches," and "for the purpose of construction of temporary sedimentation basins on a construction site which does not include placement of fill material into the navigable waters." *Ibid.* The specific exemption of these waters from the Corps' jurisdiction indicates that the 1977 Congress recognized that similarly "isolated" waters *not* covered by the exceptions would fall within the statute's outer limits.

In addition to the enumerated exceptions, the 1977 amendments included a new section, § 404(g), which authorized the States to administer their own permit programs over certain nonnavigable waters.    Section 404(g)(1) provides, in relevant part:

> "The Governor of any State desiring to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce . . . , including wetlands adjacent thereto) within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact."    33 U. S. C. § 1344(g)(1).

Section 404(g)(1)'s reference to navigable waters "other than those waters which are presently used, or are susceptible to use," for transporting commerce and their adjacent wetlands appears to suggest that Congress viewed (and accepted) the Act's regulations as covering more than naviga-

ble waters in the traditional sense. The majority correctly points out that § 404(g)(1) is itself ambiguous because it does not indicate precisely how far Congress considered federal jurisdiction to extend. *Ante*, at 171. But the Court ignores the provision's legislative history, which makes clear that Congress understood § 404(g)(1)—and therefore federal jurisdiction—to extend, not only to navigable waters and nonnavigable tributaries, but also to "isolated" waters, such as those at issue in this case.

The Conference Report discussing the 1977 amendments, for example, states that § 404(g) "establish[es] a process to allow the Governor of any State to administer an individual and general permit program for the discharge of dredged or fill material into *phase 2 and 3 waters* after the approval of a program by the Administrator." H. R. Conf. Rep. No. 95–830, p. 101 (1977), reprinted in 3 Legislative History of the Clean Water Act of 1977 (Committee Print compiled for the Committee on Environment and Public Works by the Library of Congress), Ser. No. 95–14, p. 285 (emphasis added) (hereinafter Leg. Hist. of CWA). Similarly, a Senate Report discussing the 1977 amendments explains that, under § 404(g), "the [C]orps will *continue* to administer the section 404 permit program in all navigable waters for a discharge of dredge or fill material until the approval of a State program *for phase 2 and 3 waters*." S. Rep. No. 95–370, p. 75 (1977), reprinted in 4 Leg. Hist. of CWA 708 (emphases added).

Of course, as I have already discussed, "phase 1" waters are navigable waters and their contiguous wetlands, "phase 2" waters are the "primary tributaries" of navigable waters and their adjacent wetlands, and "phase 3" waters are all other waters covered by the statute, and can include such "isolated" waters as "intermittent rivers, streams, tributaries, and perched wetlands that are not contiguous or adjacent to navigable waters." The legislative history of the 1977 amendments therefore plainly establishes that,

when it enacted § 404(*g*), Congress believed—and desired—
the Corps' jurisdiction to extend beyond just navigable wa-
ters, their tributaries, and the wetlands adjacent to each.

In dismissing the significance of § 404(g)(1), the majority
quotes out of context language in the very same 1977 Senate
Report that I have quoted above. *Ante,* at 170, n. 6. It is
true that the Report states that "[t]he committee amend-
ment does not *redefine* navigable waters." S. Rep. No. 95–
370, at 75, reprinted in 4 Leg. Hist. of CWA 708 (emphasis
added). But the majority fails to point out that the quoted
language appears in the course of an explanation of the
Senate's refusal to go along with House efforts to *narrow
the scope* of the Corps' CWA jurisdiction to traditionally
navigable waters. Thus, the immediately preceding sen-
tence warns that "[t]o limit the jurisdiction of the [FWPCA]
with reference to discharges of the pollutants of dredged
or fill material would cripple efforts to achieve the act's ob-
jectives." [14] *Ibid.* The Court would do well to heed that
warning.

The majority also places great weight, *ante,* at 171, on our
statement in *Riverside Bayview* that § 404(g) "does not *con-*

---

[14] In any event, to attach significance to the Report's statement that
the committee amendments do not "redefine navigable waters," one must
first accept the majority's erroneous interpretation of the 1972 Act. But
the very Report upon which the majority relies states that "[t]he 1972
[FWPCA] exercised *comprehensive jurisdiction* over the *Nation's waters*
to control pollution to the *fullest constitutional extent."* S. Rep. No. 95–
370, at 75, reprinted in 4 Leg. Hist. of CWA 708 (emphases added). Even
if the Court's flawed reading of the earlier statute were correct, however,
the language to which the Court points does not counsel against finding
congressional acquiescence in the Corps' 1975 regulations. Quite the con-
trary. From the perspective of the 1977 Congress, those regulations con-
stituted the status quo that the proposed amendments sought to alter.
Considering the Report's favorable references to the Corps' "continu[ing]"
jurisdiction over phase 2 and 3 waters, the language concerning the failure
of the amendments to "redefine navigable waters" cuts strongly against
the majority's position, which instead completely excises phase 3 waters
from the scope of the Act. *Ibid.*

*clusively* determine the construction to be placed on the use of the term 'waters' elsewhere in the Act," 474 U. S., at 138, n. 11 (emphasis added). This is simply more selective reading. In that case, we also went on to say with respect to the significance of § 404(g) that "the various provisions of the Act should be read *in pari materia.*" *Ibid.* Moreover, our ultimate conclusion in *Riverside Bayview* was that § 404(g) "suggest[s] strongly that the term 'waters' as used in the Act" supports the Corps' reading. *Ibid.*

## III

Although it might have appeared problematic on a "linguistic" level for the Corps to classify "lands" as "waters" in *Riverside Bayview,* 474 U. S., at 131–132, we squarely held that the agency's construction of the statute that it was charged with enforcing was entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). Today, however, the majority refuses to extend such deference to the same agency's construction of the same statute, see *ante,* at 172–174. This refusal is unfaithful to both *Riverside Bayview* and *Chevron.* For it is the majority's reading, not the agency's, that does violence to the scheme Congress chose to put into place.

Contrary to the Court's suggestion, the Corps' interpretation of the statute does not "encroac[h]" upon "traditional state power" over land use. *Ante,* at 173. "Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits." *California Coastal Comm'n* v. *Granite Rock Co.,* 480 U. S. 572, 587 (1987). The CWA is not a land-use code; it is a paradigm of environmental regulation. Such regulation is an accepted exercise of federal power. *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U. S. 264, 282 (1981).

It is particularly ironic for the Court to raise the specter of federalism while construing a statute that makes explicit efforts to foster local control over water regulation. Faced with calls to cut back on federal jurisdiction over water pollution, Congress rejected attempts to narrow the scope of that jurisdiction and, by incorporating § 404(g), opted instead for a scheme that encouraged States to supplant federal control with their own regulatory programs. S. Rep. No. 95–370, at 75, reprinted in 4 Leg. Hist. of CWA 708 ("The committee amendment does not redefine navigable waters. Instead, the committee amendment intends to assure continued protection of *all the Nation's waters*, but allows States to assume the primary responsibility for protecting those lakes, rivers, streams, swamps, marshes, and other portions of the navigable waters outside the [C]orps program in the so-called phase I waters" (emphasis added)). Because Illinois could have taken advantage of the opportunities offered to it through § 404(g), the federalism concerns to which the majority adverts are misplaced. The Corps' interpretation of the statute as extending beyond navigable waters, tributaries of navigable waters, and wetlands adjacent to each is manifestly reasonable and therefore entitled to deference.

## IV

Because I am convinced that the Court's miserly construction of the statute is incorrect, I shall comment briefly on petitioner's argument that Congress is without power to prohibit it from filling any part of the 31 acres of ponds on its property in Cook County, Illinois. The Corps' exercise of its § 404 permitting power over "isolated" waters that serve as habitat for migratory birds falls well within the boundaries set by this Court's Commerce Clause jurisprudence.

In *United States* v. *Lopez*, 514 U. S. 549, 558–559 (1995), this Court identified "three broad categories of activity that Congress may regulate under its commerce power": (1) channels of interstate commerce; (2) instrumentalities of inter-

state commerce, or persons and things in interstate commerce; and (3) activities that "substantially affect" interstate commerce. *Ibid.* The migratory bird rule at issue here is properly analyzed under the third category. In order to constitute a proper exercise of Congress' power over intrastate activities that "substantially affect" interstate commerce, it is not necessary that each individual instance of the activity substantially affect commerce; it is enough that, taken in the aggregate, the *class of activities* in question has such an effect. *Perez* v. *United States,* 402 U. S. 146 (1971) (noting that it is the "class" of regulated activities, not the individual instance, that is to be considered in the "affects" commerce analysis); see also *Hodel,* 452 U. S., at 277; *Wickard* v. *Filburn,* 317 U. S. 111, 127–128 (1942).

The activity being regulated in this case (and by the Corps' § 404 regulations in general) is the discharge of fill material into water. The Corps did not assert jurisdiction over petitioner's land simply because the waters were "used as habitat by migratory birds." It asserted jurisdiction because petitioner planned to *discharge fill* into waters "used as habitat by migratory birds." Had petitioner intended to engage in some other activity besides discharging fill (*i. e.,* had there been no activity to regulate), or, conversely, had the waters not been habitat for migratory birds (*i. e.,* had there been no basis for federal jurisdiction), the Corps would never have become involved in petitioner's use of its land. There can be no doubt that, unlike the class of activities Congress was attempting to regulate in *United States* v. *Morrison,* 529 U. S. 598, 613 (2000) ("[g]ender-motivated crimes"), and *Lopez,* 514 U. S., at 561 (possession of guns near school property), the discharge of fill material into the Nation's waters is almost always undertaken for economic reasons. See V. Albrecht & B. Goode, Wetland Regulation in the Real World, Exh. 3 (Feb. 1994) (demonstrating that the overwhelming majority of acreage for which § 404

permits are sought is intended for commercial, industrial, or other economic use).[15]

Moreover, no one disputes that the discharge of fill into "isolated" waters that serve as migratory bird habitat will, in the aggregate, adversely affect migratory bird populations. See, *e. g.*, 1 Secretary of the Interior, Report to Congress, The Impact of Federal Programs on Wetlands: The Lower Mississippi Alluvial Plain and the Prairie Pothole Region 79–80 (Oct. 1988) (noting that "isolated," phase 3 waters "are among the most important and also [the] most threatened ecosystems in the United States" because "[t]hey are prime nesting grounds for many species of North American waterfowl . . ." and provide "[u]p to 50 percent of the [U. S.] production of migratory waterfowl"). Nor does petitioner dispute that the particular waters it seeks to fill are home to many important species of migratory birds, including the second-largest breeding colony of Great Blue Herons in northeastern Illinois, App. to Pet. for Cert. 3a, and several species of waterfowl protected by international treaty and Illinois endangered species laws, Brief for Federal Respondents 7.[16]

In addition to the intrinsic value of migratory birds, see *Missouri* v. *Holland*, 252 U. S. 416, 435 (1920) (noting the importance of migratory birds as "protectors of our forests and our crops" and as "a food supply"), it is undisputed that

---

[15] The fact that petitioner can conceive of some people who may discharge fill for noneconomic reasons does not weaken the legitimacy of the Corps' jurisdictional claims. As we observed in *Perez* v. *United States*, 402 U. S. 146 (1971), "[w]here the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." *Id.*, at 154 (internal quotation marks omitted).

[16] Other bird species using petitioner's site as habitat include the " 'Great Egret, Green-backed Heron, Black-crowned Night Heron, Canada Goose, Wood Duck, Mallard, Greater Yellowlegs, Belted Kingfisher, Northern Waterthrush, Louisiana Waterthrush, Swamp Sparrow, and Red-winged Blackbird.' " Brief for Petitioner 4, n. 3.

literally millions of people regularly participate in bird-watching and hunting and that those activities generate a host of commercial activities of great value.[17] The causal connection between the filling of wetlands and the decline of commercial activities associated with migratory birds is not "attenuated," *Morrison,* 529 U. S., at 612; it is direct and concrete. Cf. *Gibbs* v. *Babbitt,* 214 F. 3d 483, 492–493 (CA4 2000) ("The relationship between red wolf takings and interstate commerce is quite direct—with no red wolves, there will be no red wolf related tourism . . .").

Finally, the migratory bird rule does not blur the "distinction between what is truly national and what is truly local." *Morrison,* 529 U. S., at 617–618. Justice Holmes cogently observed in *Missouri* v. *Holland* that the protection of migratory birds is a textbook example of a *national* problem. 252 U. S., at 435 ("It is not sufficient to rely upon the States [to protect migratory birds]. The reliance is vain . . ."). The destruction of aquatic migratory bird habitat, like so many other environmental problems, is an action in which the benefits (*e. g.,* a new landfill) are disproportionately local, while many of the costs (*e. g.,* fewer migratory birds) are widely dispersed and often borne by citizens living in other States. In such situations, described by economists as involving "externalities," federal regulation is both appropriate and necessary. Revesz, Rehabilitating Interstate

---

[17] In 1984, the U. S. Congress Office of Technology Assessment found that, in 1980, 5.3 million Americans hunted migratory birds, spending $638 million. U. S. Congress, Office of Technology Assessment, Wetlands: Their Use and Regulation 54 (OTA–O–206, Mar. 1984). More than 100 million Americans spent almost $14.8 billion in 1980 to watch and photograph fish and wildlife. *Ibid.* Of 17.7 million birdwatchers, 14.3 million took trips in order to observe, feed, or photograph waterfowl, and 9.5 million took trips specifically to view other water-associated birds, such as herons like those residing at petitioner's site. U. S. Dept. of Interior, U. S. Fish and Wildlife Service and U. S. Dept. of Commerce, Bureau of Census, 1996 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation 45, 90 (issued Nov. 1997).

Competition: Rethinking the "Race-to-the-Bottom" Rationale for Federal Environmental Regulation, 67 N. Y. U. L. Rev. 1210, 1222 (1992) ("The presence of interstate externalities is a powerful reason for intervention at the federal level"); cf. *Hodel*, 452 U. S., at 281–282 (deferring to Congress' finding that nationwide standards were "essential" in order to avoid "destructive interstate competition" that might undermine environmental standards). Identifying the Corps' jurisdiction by reference to waters that serve as habitat for birds that migrate over state lines also satisfies this Court's expressed desire for some "jurisdictional element" that limits federal activity to its proper scope. *Morrison*, 529 U. S., at 612.

The power to regulate commerce among the several States necessarily and properly includes the power to preserve the natural resources that generate such commerce. Cf. *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941, 953 (1982) (holding water to be an "article of commerce"). Migratory birds, and the waters on which they rely, are such resources. Moreover, the protection of migratory birds is a well-established federal responsibility. As Justice Holmes noted in *Missouri* v. *Holland*, the federal interest in protecting these birds is of "the first magnitude." 252 U. S., at 435. Because of their transitory nature, they "can be protected only by national action." *Ibid.*

Whether it is necessary or appropriate to refuse to allow petitioner to fill those ponds is a question on which we have no voice. Whether the Federal Government has the power to require such permission, however, is a question that is easily answered. If, as it does, the Commerce Clause empowers Congress to regulate particular "activities causing air or water pollution, or other environmental hazards that may have effects in more than one State," *Hodel*, 452 U. S., at 282, it also empowers Congress to control individual actions that, in the aggregate, would have the same effect.

*Perez,* 402 U. S., at 154; *Wickard,* 317 U. S., at 127–128.[18] There is no merit in petitioner's constitutional argument.

Because I would affirm the judgment of the Court of Appeals, I respectfully dissent.

---

[18] JUSTICE THOMAS is the only Member of the Court who has expressed disagreement with the "aggregation principle." *United States* v. *Lopez,* 514 U. S. 549, 600 (1995) (concurring opinion).